**FILED**

DEC 18 2023

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

1   CARL A. WESCOTT
    8210 E. Via de la Escuela
2   Scottsdale, AZ 85258
    *in propria persona*
3   +1 276 773 7377

4

5              **UNITED STATES DISTRICT COURT**            KAW

6              **DISTRICT OF CALIFORNIA - NORTHERN**

7                                              **CV23-6624**

8   CARL A. WESCOTT,                 Civil Action No.

9                    Plaintiff,      **PLAINTIFF'S VERIFIED LEGAL
                                     COMPLAINT FOR BREACH OF
10                                   CONTRACT; WAGE THEFT;
         vs.                         COMMON LAW FRAUD; BREACH OF
11                                   FIDUCIARY DUTY; TORTIOUS
                                     INTERFERENCE WITH CONTRACT;
    BERNARD MOON;                    UNJUST ENRICHMENT; and BREACH
12                                   OF THE COVENANT OF GOOD FAITH
                    Defendant        AND FAIR DEALING;
13

14       + DOES 1 to 10             **JURY TRIAL REQUESTED**

15

16       Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendant Bernard Moon, and in

17   support of his complaint, he states as follows:

18

19
    **Parties**
20

21   1.  The Defendant Mr. Bernard Moon is a long-time San Francisco Bay Area resident who made a

22       job offer to the Plaintiff, and also promised other monies to the Plaintiff for services rendered.

23   2.  The Plaintiff is a resident of Scottsdale, AZ.  During the time he worked for the Mr. Moon as a

24       full-time employee, the Plaintiff was a resident of San Francisco.

25       **VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;
26       WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST
         ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH &
         FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

                                              1

1

## VENUE AND JURISDICTION

2

3.  Venue is appropriate in this Court as Bernard Moon's initial acts of perjury and forgery were

3

directed at this district. Indeed, Mr. Moon's forged paperwork was submitted under penalty of

4

perjury in response to a San Francisco Superior Court matter.

5

6

4.  Further, the Plaintiff, a former San Francisco resident while he worked as a full-time employee

7

for the SparkLabs Group, filed the relevant labor claim with the San Francisco Labor

8

Commissioner, that Mr. Moon interfered with. (From a 28 USC 1332 standpoint for complete

9

diversity of citizenship, the Plaintiff moved to Arizona in 2019 before he filed his wage theft

10

complaint).

11

5.  Mr. Moon also resides in this district, in Palo Alto.

12

6.  Thus, this Court has multiple ways it can assert jurisdiction over this Defendant.

13

14

15

## CASE SUMMARY

16

Defendant Mr. Moon offered the Plaintiff a full-time job at $150,000 per year salary in 2017

17

(in writing, in email). The Plaintiff accepted Mr. Moon's offer in writing, forming a contract. The

18

Plaintiff began work for Mr. Moon in late 2017 but wasn't getting paid his salary. This was due to

19

securities fraud the Plaintiff discovered in late 2017. Mr. Moon promised to pay the Plaintiff's salary

20

another way, and the Plaintiff worked for him and for the SparkLabs Group through July 4th, 2019.

21

The Plaintiff is also owed other amounts by Mr. Moon and the SparkLabs Group.

22

23

The Plaintiff filed a labor claim with the California Labor Commissioner in June 2020 over

24

his unpaid salary of approximately $259,897.26 (as of June 2019), including one-month's salary

25

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;
WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST**

26

**ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH &
FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

2

penalty for paying late, but not including interest. Including interest, the wage theft claim is now worth over $350,000, prior to the statutory doubling. The reason the Plaintiff was not awarded his salary in the labor claim is that Defendant Mr. Bernard Moon lied to the tribunal and claimed that the Plaintiff was not an employee. Showing Mr. Moon's culpability, he forged a document in Court omitting the Plaintiff's actual job offer and salary, committing perjury, forgery and other crimes. The Plaintiff's labor claim was dismissed without prejudice in 2021, not due to any issue with his claim, but rather because the State of California had a multi-year backlog of cases due to a combination of employee attrition and a flood of claims during the COVID crisis of 2020 to 2021. The reason the Plaintiff's labor claim was not cut and dry, immediately leading to an order for salary owing to be paid, was that Mr. Moon and his attorney repeatedly lied to the Labor Commissioner.

Besides cash compensation owing of over $500,000 (over $900,000 with the statutory doubling of his unpaid salary), the Plaintiff is owed for what would have been his carried interest and incentive compensation (3% and 36% of the entity that turned out to be entirely fraudulent).

This legal complaint deals with the Plaintiff's original claim based on Moon and SparkLabs not paying him $150,000 per year as promised, other monies promised by Moon and owed by Moon, and Moon's lies to the Labor Commissioner which cost him what is now over $407,922.83 of salary including interest, before statutory doubling.

**FURTHER ALLEGATIONS REGARDING CONSPIRACY**

7. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint,

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

Mr. Bernard Moon, as an individual, in addition to acting for himself individually, as well as for the benefit of his marital community, is and was acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

8.  Plaintiff further alleges on information and belief that the acts and non-acts of each of the individual Defendants were fully ratified by each and all the other Defendants.

9.  Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the individual Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

10. In addition, upon information and belief, there exist one or more nefarious corporate, trust, LLC or other entity type Defendants involved in these conspiracies.  They shall emerge with the benefit of legal discovery.

11. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, in addition to acting for itself and for its own behalf, was and were acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and individual) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

12. Plaintiff further alleges on information and belief that the acts of each of those entity Defendants were fully ratified by each and all the Defendants.

13. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of those specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

## Subject-Matter Jurisdiction – Background and Legal Standards

1. With damages of $75,000 and the diversity of citizenship of Plaintiff and Defendants, the Plaintiff would qualify for United States District Court under 28 U.S. Code § 1332(a)(1):

> DIVERSITY OF CITIZENSHIP; AMOUNT IN CONTROVERSY; COSTS
>
> **(a)**The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
> > **(1)** citizens of different States;  (*28 U.S. Code § 1332 (a)(1)*)

2. The Plaintiff resides in Arizona and the Defendant is a citizen of California.

3. Thus, the parties have complete diversity of citizenship.

4. The Plaintiff will add the facts, logic, and reasoning supporting that his recoverable damages will be greater than US $75,000.

5. To qualify for federal court under complete diversity of citizenship, the amount in controversy must exceed the sum or value of $75,000, exclusive of interest and costs (*28 U.S.C. § 1332(a) (2014)*).

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

6. The determination of the amount in controversy for federal subject matter jurisdiction is an issue decided under federal law. 14AA FEDERAL PRACTICE AND PROCEDURE § 3702 (4th ed. 2014) [hereinafter "FEDERAL PRACTICE"]. See *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 352 (1961).

7. Federal courts will, however, look to applicable state law to determine the nature of the plaintiff's substantive claim and related damages. FEDERAL PRACTICE § 3702. See *Horton*, 367 U.S. at 352-353.

8. Numerous courts, including the United States Supreme Court have held that the amount in controversy for jurisdictional purposes is measured by the direct pecuniary value of the right that the plaintiff seeks to enforce or the value of the object that is the subject matter of the suit. FEDERAL PRACTICE § 3702.5. See *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L. Ed. 1067 (1947).

9. The direct pecuniary value of the right is simply an estimate of the total amount in dispute rather than an assessment of liability. *Lewis v. Verizon Communications, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010).

10. The amount in controversy is determined without considering accrued or accruing interest or the costs associated with the lawsuit. (*28 U.S.C. § 1332(b)*)

11. Courts have held that collateral effects will not be taken into account when calculating the amount in controversy. FEDERAL PRACTICE § 3702.5. See *Healy v. Ratta*, 292 U.S. 263, 267 (1934) ("the collateral effects of the decree, by virtue of stare decisis, upon other and distinct controversies, may not be considered in ascertaining whether the jurisdictional amount is

VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;
WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST
ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH &
FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY

involved, even though their decision turns on the same question of law."). See also *New England Mortg. Sec. Co. v. Gay*, 145 U.S. 123, 130 (1892) ("It is well settled in this court that, when our jurisdiction depends upon the amount in controversy, it is determined by the amount involved in the particular case, and not by any contingent loss either one of the parties may sustain by the probative effect of the judgment, however certain it may be that such loss will occur.").

12. The amount in controversy may include compensatory damages including general and special damages such as pain and suffering and out of pocket loss. The amount in controversy may also include punitive damages. *Anthony v. Security Pac. Fin. Servs., Inc.*, 75 F.3d 311, 315 (7th Cir. 1996); *Watson v. Blankinship*, 20 F.3d 383, 386-387 (10th Cir. 1994).

13. When there is direct legal authority, by statute or contract, for the recovery of attorneys' fees, then the fee claim may be included in determining the amount in controversy regardless of whether the award of fees is mandatory or discretionary. *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 155-1156 (9th Cir. 1998).

**Subject-Matter Jurisdiction with the Alleged Facts of this Particular Case**

14. The Plaintiff plans to get an attorney for this case in the future when the Plaintiff can afford one.

15. Or, in the alternative, the Plaintiff believes he will be able to retain a contingency attorney for this case, once he has developed the record a little.

16. One small part of this legal case is the $259,897.26 owed for the Plaintiff's salary.

17. The Plaintiff is also owed $50,000 for bringing Major League Baseball as an investor.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

18. The Plaintiff is also owed the equity value of 3% of SparkLabs Korea II, by his reasoning. The latter is worth at least hundreds of thousands of dollars.

19. Finally, the Plaintiff is owed $50,000 that Mr. Moon promised to pay him in writing (by email) in June 2019.

20. Adding these amounts together, with the statutory doubling of his salary and interest, the Plaintiff is owed well over $900,000.

21. His base damages (over $900,000) far exceed the threshold ($75,000) for federal subject-matter jurisdiction.

**Note about the Statutes of Limitations**

22. Mr. Moon is out of California, including out of the country, over 1/3rd of the time, and thus the statutes of limitations on these causes of action have considerable tolling. They likely have over a year of tolling.

**Underlying Facts – Background on Accelerator Funds and SparkLabs**

23. Accelerator funds are a type of venture capital fund, with a slightly different model. Venture capital funds are more hands-off and often later-stage than most accelerator funds and invest almost all their raised capital in companies (minus management fees).

24. Accelerator funds, like Y Combinator (https://www.ycombinator.com/), get involved with startups at an earlier stage than most venture capital investments. Most accelerator funds invest smaller amounts than venture capital funds per startup (US $30,000 to US $100,000 is a typical

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

investment), at a lower valuation (accelerators often get 6% to 10% of a startup or more), but the accelerator funds invest a lot of time and expertise along with their capital to help guide the startups so they can grow their business and raise further needed capital.

25. Accelerator funds typically group their investments into classes, or cohorts, that they then assist for three to five intensive months, culminating in a Demo Day where each startup in the cohort does a presentation for investors.

26. The accelerator fund model, when properly executed, has been demonstrated to yield high returns and to generate significant equity in funds and their portfolio companies.

27. Based on the success of Y Combinator, Tech Stars, 500 Startups, Venture Catalysts, Startup Boot Camp, and other accelerators, there are now thousands of accelerator funds worldwide.

**Underlying Facts – SparkLabs Group and SparkLabs IoT**

28. The Plaintiff is a former employee of Mr. Moon and the SparkLabs Group, and prior to that and in parallel, a mentor at many of the SparkLabs accelerator funds for its portfolio companies.

29. From SparkLabs' inception in 2012 through mid-2019, the Plaintiff was a mentor at SparkLabs Seoul (funded for those time periods by Korea Fund I and Korea Fund II, two SparkLabs funds), and other SparkLabs accelerators.

30. Beginning in 2016, the Plaintiff was a Venture Partner at the SparkLabs Group, based partially on a US $50,000 investment he made into what he thought was the SparkLabs IoT Accelerator Fund ("SparkLabs IoT"), with 3% ownership of the General Partner ("GP") of SparkLabs IoT.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

31. In August 2017, Mr. Bernard Moon, founding partner of the SparkLabs Group, offered the Plaintiff a full-time job at the SparkLabs Group, specifically to be the Managing Director and fund manager of the SparkLabs IoT Accelerator Fund ("SparkLabs IoT") (The web site was at www.sparklabsiot.com.  The 2019 web site can be viewed at http://web.archive.org/web/20190324090549/http://www.sparklabsiot.com/en/index.php)

32. According to Mr. Moon, in private communications with the Plaintiff in 2017, as well as many statements broadcast to the public (such as here https://hackernoon.com/sparklabs-group-a-new-beginning-cf1e49c7afe7), SparkLabs IoT had raised enough money to fund sixteen (16) investments in IoT companies in its first batch.

33. At the link above, Mr. Moon falsely claims that SparkLabs IoT invested $50,000 in Drop (https://getdrop.com/) – it was actually Korea Fund II that wired those monies, and Drop is a now a Korea Fund II portfolio company (after being moved to the fund that had actually funded the investment in the company in 2018)

34. The SparkLabs IoT website, in 2019, viewable today at the link above, still claims to have those sixteen (16) companies in its portfolio.

35. According to Mr. Moon and other SparkLabs partners and stakeholders in private communications, SparkLabs IoT was to receive about US $1 million a year in grants from the South Korean government, personally promised by South Korean President Park Geun-hye.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

**The Plaintiff starts his full-time job as a Managing Director with a US $150,000 salary...**

36. The Plaintiff accepted Mr. Moon's job offer and began full-time employment at his new job on October 26th, 2017.

37. However, by December 2017, the Plaintiff discovered and figured out that something was amiss at the SparkLabs Group.

38. More specifically, the Plaintiff discovered that all the statements that Mr. Moon had made to him and the general public about SparkLabs IoT having already raised money (other than from the Plaintiff, ironically) and made those 16 investments were lies.

39. With former South Korean President Park Geun-hye impeached and removed from office (soon to be sentenced to 24 years in prison for corruption, on April 6th, 2018), it did not appear that the grant money President Park had promised would still be coming in.

40. The SparkLabs IoT General Partner (of the SparkLabs IoT fund, a Limited Partnership) had essentially no money and could not pay the Plaintiff's salary.

**... but discovers securities fraud at the SparkLabs Group and SparkLabs IoT**

41. The SparkLabs IoT General Partner ("GP") had borrowed over US $747,000 from Korea Fund, II ("KF II"), another SparkLabs accelerator fund, to make the sixteen (16) investments in SparkLabs IoT companies.

42. While the SparkLabs IoT GP owned the shares and equity in those startups, Korea Fund, II had made all the wires to the companies.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

43. Undisclosed, unapproved inter-fund loans are prohibited by the federal and state securities laws of the United States (including California's securities laws), in *Rules 17(a) and 10B-5.*

44. False statements (related to securities offerings) made to investors and prospective investors are also illegal and prohibited by the federal and state securities laws of the United States, also including California securities laws.

45. Finally, false statements (related to securities offerings) made to the general public are also illegal and prohibited by the federal and California securities laws of the United States

46. Thus, for the SparkLabs IoT fund alone, there were multiple types of securities fraud that the Plaintiff discovered at SparkLabs.

47. The Plaintiff refused to raise money for the SparkLabs IoT accelerator fund due to the securities fraud issues.

48. The Plaintiff did not wish to have any involvement with activities that were illegal or immoral.

49. Not only did the Plaintiff not wish to commit criminal acts, but he also would not have been able to have conversations with prospective investors without disclosing these issues, which would prevent any prudent investor from making an investment.

50. Later, the Plaintiff refused to raise money for other funds that he discovered also had securities fraud issues.

51. The Plaintiff did invest some time into raising money towards "clean" funds: funds he believed were not tainted by the securities fraud, but he later realized that even that would be problematic, as the issues in other SparkLabs funds, that could have a material impact on all SparkLabs entities, would have to be disclosed.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

52. In early 2018, to protect SparkLabs investors, the Plaintiff insisted that these securities fraud issues be cleaned up as best as possible.  As part of that, the discrepancy between Korea Fund II (that had made the SparkLabs IoT investments) and SparkLabs IoT (that owned shares in 16 portfolio companies but had not paid for them) would need to be fixed.

53. SparkLabs partners Bernard Moon, Jimmy Kim, and Eugene Kim, most active in these discussions, agreed with the Plaintiff that the above issues would be cleaned up.  (SparkLabs partners Hanjoo Kim, Frank Meehan, and Jay McCarthy were copied on emails and were aware of these issues but were less-active participants in these discussions).

54. As the second phase of cleanup, the Plaintiff also insisted on a new clean fund to be set up (not tainted by securities fraud), full disclosure to investors, the SEC, the public, and other necessary stakeholders.  The Plaintiff suggested that a new law firm be retained to further investigate and advise on what needed to be done, and to coordinate those activities until complete.

55. In 2018 and early 2019, the Plaintiff worked with Eugene Kim, Jimmy Kim, and others to inform the sixteen (16) portfolio companies what had happened, and to move/correct issued shares, investor agreements, and capitalization tables to reflect that Korea Fund II had made the 16 IoT company investments, and not SparkLabs IoT.

56. Because SparkLabs IoT had no money and the $1 million a year grant money had not come in, the Plaintiff's salary ($12,500 per month) was not being paid.

57. However, Bernard Moon and other partners (but primarily Bernard Moon, who the Plaintiff reported to for much of his SparkLabs tenure) continued to insist that the Plaintiff's salary would be paid, when they had the cash.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

13

58. The Plaintiff, post-bankruptcy and homelessness, was in a vulnerable position and had no choice but to accept, as SparkLabs, minus its fraud issues, was a good opportunity, and he believed that the securities fraud was now going to be discontinued, clean up as best as possible, and disclosed to investors and regulatory agencies, and that SparkLabs would move on from there.

59. Because there was not much for the Plaintiff to do in his original expected job as the Managing Director of SparkLabs IoT (as there was no money to invest, due to the securities fraud issues), the Plaintiff was instead requested to do many more things to help many other SparkLabs accelerators and dozens of portfolio companies.

60. Among other tasks, the Plaintiff helped portfolio companies market and sell, helped founders get their visas, wrote up investment documents, did outreach to various communities, attended many events and conferences on behalf of SparkLabs (including GAN events), sourced deal flow, and evaluated investment opportunities

61. The Plaintiff also worked on setting up two new accelerators in Singapore, supported every operating and nascent accelerator fund, and came up with two new programs for SparkLabs: (1) Blitzscaling (or speedscaling), and as part of that, (2) a program to help portfolio companies market and sell in to various industries worldwide.  (SparkLabs fully endorsed, adopted, and rolled out the Blitzscaling initiative, which continues to this day, after the Plaintiff's departure)

62. The Plaintiff participated in conferences, created content, recruited general partners and mentors, put together panels on robotics and quantum computing, and interviewed investors and entrepreneurs, including on stage at Demo Days and special events.  The Plaintiff successfully recruited desirable panel speakers for other events, including a kickoff to recruit institutional

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

investors in Hong Kong (where Jeff Clavier participated, leading to him participating in other events, and then Mr. Clavier's firm leading a multimillion-dollar investment in a SparkLabs portfolio company).

63. The Plaintiff also acted as a "concierge" to some of founders and program directors of some of the newer SparkLabs accelerator funds, assisting with all aspects of their operations depending on their needs.  The Plaintiff helped individual portfolio companies with their pitches, outreach, designs, engineering issues, strategy, recruiting, branding, marketing and sales

64. The Plaintiff also helped SparkLabs portfolio companies (such as Locus Labs, Bioinspira, N.thing, and Augmented Knowledge) as well as companies in the SparkLabs family (e.g., Katerra) sell their products and services, primarily in Asia and the United States.

**The Plaintiff is wrongfully terminated in retaliation for protected activities (whistleblowing)**

65. In early March 2019, in a brief phone call, Bernard Moon informed the Plaintiff that SparkLabs was not going to shut down the current tainted SparkLabs IoT fund, was not going to start a new clean fund, and was not going to retain a new law firm nor disclose what had happened.  (Phone records will show the exact date of that phone call).

66. In response, in that same phone call, the Plaintiff then threatened to whistleblow and tip off the SEC and law enforcement as to the securities fraud.  Mr. Moon hung up the call.

67. Upon information and belief, at that point, Mr. Moon decided to fire the Plaintiff in retaliation for insisting that the securities fraud be cleaned up, and in retaliation for threatening to tip off and whistleblow the SparkLabs securities fraud issues to the SEC and to law enforcement

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

68. The Plaintiff did in fact, whistleblow the securities fraud he discovered not only in SparkLabs IoT but in many other SparkLabs funds to the SEC, DBO, and other law enforcement and regulatory agencies. Exhibit B contains one of the Plaintiff's tips to the SEC.

69. Upon information and belief, the Plaintiff now believes that right after the early March 2019 phone call, Mr. Moon and other SparkLabs Groups partners also decided to discredit the Plaintiff and to blacklist and blackball him.

**Felonies committed by Mr. Moon**

70. Upon information and belief, the Plaintiff now believes that right after the early March 2019 phone call, Mr. Moon and his partners at SparkLabs also decided not to pay the Plaintiff's salary owing.

71. Mr. Moon certainly decided that he would do almost anything to avoid paying the Plaintiff the salary he was and is owed of over US $259,897.26 (as of June 2019), including committing felonies and a strong possibility of him going to jail.

72. As partial evidence of that, in response to a subpoena related to the Plaintiff's compensation, Mr. Moon forged a document (the Plaintiff's original job offer email), removing the Plaintiff's US $150,000 per year salary wording from it, and submitted it to a Court as the true and correct document under penalty of perjury, thus committing multiple felonies.

73. If Mr. Moon was and is ready to go to commit felonies and go to jail for his acts of retaliation for the Plaintiff's threatening to whistleblow and then whistleblowing securities fraud to the

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;
WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST
ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH &
FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

SEC and DBO and other regulatory agencies, Mr. Moon clearly takes his grudges and acts of revenge pretty seriously!

74. Exhibit C is the actual email with Mr. Moon's job offer to the Plaintiff, and Exhibit D contains Mr. Moon's forged version that Mr. Moon submitted to a San Francisco court under penalty of perjury. (Mr. Moon altered the actual job offer email that contained the $150,000 salary, forging a new document lacking the salary, as one can see in Exhibit D, and then stated that the forged/altered version was the correct one under penalty of perjury).

75. Thus, Mr. Moon, in that act alone, committed several felonies. Exhibit E contains a discussion of Mr. Moon's criminal acts under California law, including the specific references to the California penal code for Mr. Moon's multiple felonies and other crimes for that particular act of attempted revenge, retaliation, and deceit.

76. The Plaintiff emailed the main SparkLabs partners in June 2019 and beyond about not only the securities fraud (which they were obviously aware of) but also about the wage theft, perjury, forgery and other crimes Mr. Moon committed.

77. Rather than fix any of those issues, those SparkLabs partners, including Jimmy Kim, Hanjoo Lee, Eugene Kim, Frank Meehan, Jay McCarthy, Rob Demillo, Scott Sorochak, Edgar Chiu, Mike Bott, and Brian Park, doubled down on their crimes and have fully ratified all acts of securities fraud, perjury, forgery, falsification of Court evidence, and conversion/theft. That will be addressed separately.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;
WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST
ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH &
FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

78. In another phone call with Mr. Moon in approximately May 2019 (phone records will show the exact date and time), when Mr. Moon was briefly in Ireland on a business trip, Mr. Moon referred to what the Plaintiff had done as a "dirty trick", and told the Plaintiff:

- That he (Bernard Moon) would ensure that the Plaintiff would be erased from all SparkLabs records as if the Plaintiff did not exist (the Plaintiff still does not understand that threat, but hopefully this does not mean that Mr. Moon and partners destroyed evidence).

- That Mr. Moon and the SparkLabs Group would terminate all personal and professional relationships with the Plaintiff.

- That Mr. Moon and the SparkLabs Group would "expose" the Plaintiff as a liar and a fraud.

- That Mr. Moon and the SparkLabs Group would do everything they could to ensure that the Plaintiff could not work in venture capital, with accelerator funds, and with startups ever again.

- That Mr. Moon and the SparkLabs Group would do everything they could to discredit the Plaintiff and ruin his career… and that the Plaintiff would "die in poverty."

79. Obviously, given Mr. Moon's rant, and his raised voice, Mr. Moon was not happy with the Plaintiff.  Interestingly, at that point, despite having decided to commit wage theft and not pay the Plaintiff's salary owing, Mr. Moon did not say that the Plaintiff would not be paid.

80. Mr. Moon's promises to pay the Plaintiff continued through April 2019, May 2019, including as part of the conversations about the Plaintiff's departure from SparkLabs.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;
WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST
ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH &
FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

81. As an agreement to a suggestion made by the Plaintiff to pay the then-more-than-$300,000 of cash compensation owed, to make a series of $50,000 payments, Mr. Moon agreed to pay the first payment of $50,000.

82. Mr. Moon emailed the Plaintiff stating that he would pay that first $50,000 soon.

83. The Plaintiff also believes he was wrongfully terminated in retaliation for his protected acts and activity, as Mr. Moon continued to come up with ridiculous reasons for the Plaintiff having less responsibility, as well-documented in email, as steps towards his firing.

84. On June 20th, 2019, Mr. Moon emailed the Plaintiff firing him from his full-time job at the SparkLabs Group (the Plaintiff read the email on June 21st, 2019). The Plaintiff's salary remained unpaid as of that point and still remains unpaid.

85. The Plaintiff had two weeks of SparkLabs commitments he had made where people depended on him, including over 10 days with various commitments in Seoul, so his last day was to be July 4th, 2019.

86. On June 23rd, 2019, the Plaintiff travelled to Seoul, Korea. SparkLabs had paid for a week of hotel for the Plaintiff, with a non-refundable payment.

87. Only after arriving in South Korea to work did the Plaintiff find out that SparkLabs had cancelled his non-refundable hotel rooms.

88. SparkLabs disinvited him from its Demo Day events, which are open to the public.

89. One of the reasons the Plaintiff travelled to Seoul was to give a talk at a local university (Inha University) on June 28th, 2019 on entrepreneurship, arranged by Dr. Geun-Sik Jo, founder of Augmented Knowledge.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

90. Dr. Jo was paying a $800 honorarium and promised to reimburse some of the Plaintiff's travel expenses (e.g. hotel rooms, as SparkLabs had already paid for the Plaintiff's airfare).

91. The Plaintiff showed up to give the talk.

92. Two days before the talk, after the Plaintiff had already travelled to Seoul to give the talk, Dr. Jo cancelled the talk.  No honorarium was paid, and the Plaintiff's expenses remain unreimbursed.

93. Because Mr. Jimmy Kim is Dr. Jo's *seonbae* (선배), the Plaintiff believes that it was Mr. Kim who (at Bernard Moon's request or in conjunction with Mr. Kim) ordered Dr. Jo to reduce the Plaintiff's salary to $0, not pay his salary, cancel his arranged Seoul talk at the last minute, and not reimburse his expenses as promised.

94. The Plaintiff's last day at the SparkLabs Group was July 4th, 2019, with his efforts to meet his last SparkLabs commitments and not leave SparkLabs partners, portfolio companies, and public audiences in the lurch.

95. The Plaintiff travelled back to California on July 4th, 2019.

**OTHER MONIES OWED BY BERNARD MOON**

96. The Plaintiff is also owed $50,000 that Bernard Moon had promised to pay for bringing Major League Baseball ("MLB") as an investor in an investment that closed, with MLB investing $1 million into SparkLabs' seed fund.  That should have been settled by July 7th, 2019, per California law.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

97. The Plaintiff is also owed the $50,000 that Mr. Moon promised to pay him in writing – that was a June 2019 email. In the Plaintiff's mind, that was to be the first of a number of payments to get square on over $300,000 owing to the Plaintiff at that point.

98. That $50,000 should have been settled by July 7th, 2019, per California law.

99. The $265,650.68 of unpaid salary, including the Labor Code 203(a) penalty, but not including other applicable penalties, should have been paid by July 7th, 2019.

100.    Adding these amounts together, with the statutory doubling of his salary and interest, the Plaintiff is owed well over $800,000 of cash compensation.

101.    The Plaintiff is also owed the equity value of 3% of SparkLabs Korea II, by his reasoning. The latter is worth at least tens of thousands of dollars, and likely is worth 6 digits. (The Plaintiff would need information he will obtain in discovery to know what the value is).

102.    The Plaintiff's reasoning is that the Plaintiff was granted 3% of SparkLabs IoT by Mr. Moon, which per Mr. Moon's public claims and promises to Plaintiff was a viable fund that had invested in 16 IoT companies (and was to get the KRW equivalent of $1 million per year for the Plaintiff to invest as a fund manager). However, Mr. Moon had lied about the securities at hand. It was actually "KF II" (Korea Fund II) that made all those investments in the IoT companies, and that was the viable fund, a going concern. KF II is the one that has those 16 investments in its portfolio.

103.    The Plaintiff respectfully suggests that this Court, that has the inherent power to correct injustices, should consider awarding him 3% of KF II, or the cash equivalent.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

104.    Mr. Moon also promised and granted the Plaintiff another 36% of the SparkLabs IoT General Partner as his incentive compensation on top of his promised salary.  However, SparkLabs IoT was riddled with securities fraud and never was a going concern, despite false statements to the contrary by Mr. Moon to the Plaintiff and to the general public.

105.    With the same reasoning, the Plaintiff respectfully suggests that this Court, that has the inherent power to correct injustices, should consider awarding him 36% of KF II, or the cash equivalent.

## CASH COMPENSATION OWED SHOULD HAVE BEEN PAID BY JULY 7TH, 2019

106.    All the cash compensation owed (over $800,000, by the Plaintiff's math) should have been settled shortly after the Plaintiff's last day of July 4th, 2019, within 72 hours under California law (so by July 7th, 2019).

107.    Given that Mr. Moon has travelled outside of California for over a year of the last four or so years, the Plaintiff is within the statute of limitations on his original claims (due to the tolling of the statute of limitations).

108.    Mr. Moon then tortiously interfered with the Plaintiff's labor claim on his unpaid salary, instructing his attorney, Mr. Daniel, to provide a series of lies to the Labor Commissioner (including on July 31st, 2020 – Exhibit G has the first 7 pages of Mr. Moon's filing).

109.    The Plaintiff will provide further color on Mr. Moon's tortious interference with his labor claim, below.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

110.   Through agency, Mr. Moon (the principal) is responsible and liable for the tortious acts of his attorney (the agent).

**The Plaintiff's Labor Claim for his Unpaid Salary**

111.   Mr. Moon was the one who made the promise to the Plaintiff of the $150,000 salary.

112.   Mr. Moon was also the one who later forged a document and submitted it to a Court in this district to try and cover up that fact.

113.   The Plaintiff made a claim to the California Labor Commissioner for his unpaid salary, part of what was owed by Mr. Moon and SparkLabs.

114.   Through July 4th, 2019, the Plaintiff's last day, the Plaintiff would be owed $253,150.68 ($265,650.68 including the statutory one-month penalty).  (Exhibit F contains the labor claim).

115.   Under California labor law, working full-time for SparkLabs in California, with a boss (Bernard Moon) who was and is also a California resident, there are many statutory penalties that also apply.

116.   Applying just one of those, under Labor Code 203(a), there is a one-month statutory penalty for not paying salaries when due, and thus, as of July 4th, 2019, including the Labor Code 203(a) penalty, the Plaintiff is owed $265,650.68 of unpaid salary.

117.   The Plaintiff submitted a wage theft labor claim to the California Labor Commissioner's office on June 18th, 2020, seeking compensation from the SparkLabs Group, the umbrella entity of SparkLabs, encompassing its accelerator funds (www.sparklabsgroup.com).

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

125.  As the interested reader can see, the great majority of the statements made are lies made to attempt to avoid paying the Plaintiff the salary he is owed.

126.  The Plaintiff will make a statement by statement filing comparing the truth with Mr. Moon's lies (through his agent Mr. Daniel).

127.  Every one of these differences can be fully proven at jury trial.

128.  Mr. Daniel does not represent SparkLabs or any of its entities, and thus, it appears that Mr. Daniel has not only lied to a tribunal repeatedly in his filing, but also sought to mislead the tribunal about whom he represents.

129.  (Again, Mr. Daniel is Mr. Moon's attorney handling the civil side of Mr. Moon's misdeeds at SparkLabs, including the securities fraud, other types of fraud, forgery, perjury, wage theft, and falsification of court evidence).

130.  The Plaintiff submitted a brief response to the Labor Commissioner in response to Defendant's submission, attached as Exhibit H.

131.  As part of Mr. Moon's conspiracy for wage theft and to aid and abet SparkLabs' wage theft by lying to various third parties including the Labor Commissioner, Mr. Moon lied repeatedly (through his attorney) to continue SparkLabs' acts of retaliation, wage theft and fraud.

132.  Had the Defendant told the truth, the Plaintiff would have been paid the $265,650.68 owing, along with other statutory penalties, and 10% compounded interest back to July 4th, 2019. That sum is part of the Plaintiff's base damages resulting from a subset of the Defendant's tortious acts.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;
WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST
ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH &
FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

133.    But for Mr. Moon's lies, the Labor Commissioner would have ordered Mr. Moon and the SparkLabs Group to pay the Plaintiff the $265,650.68 owing, plus 10% compounded interest going back to July 4th, 2019 (or $407,922.83 as of December 7th, 2023).

134.    As an investment firm with assets, Mr. Moon and the SparkLabs Group would of course have followed the Labor Commissioner's order and paid the Plaintiff.

135.    In 2021, the Labor Commissioner dismissed his claim without prejudice (Exhibit I).

136.    As it turns out, the Plaintiff's claims about securities fraud were true.

137.    He whistleblew to the SEC, and the SEC announced censure and fines for Mr. Moon and SparkLabs (Exhibit J).

138.    However, the Plaintiff is still owed over $900,000 of cash compensation, as well as equitable remedies this Court will order in the future over his 3% of SparkLabs IoT and his other 36% of the GP of SparkLabs IoT.

139.    The Plaintiff has been left with no choice but to file this legal complaint to right the scales of justice.

140.    Under the Seventh Amendment to the United States Constitution, the Plaintiff has a right to a jury trial for his Constitutionally-protected petitioning rights.  (Also, as per *Fed. R. Civ. P 38(b)*).

141.    The Plaintiff hereby respectfully requests a jury trial on all issues raised herein, including all triable facts and issues related to his current causes of action and any facts, issues, requests, and/or causes of action that the Plaintiff or his future attorney may add within the timelines allowed by this Court.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

## Count I – Breach of Contract (for salary)

142. The Plaintiff realleges paragraphs 1-141 as if fully set out herein.

143. Bernard Moon offered Plaintiff a full-time job in August 2017, with a salary of US $150,000 per year (in writing, by email).

144. The Plaintiff accepted that offer in writing and began work on October 26th, 2017.

145. Thus, the parties had a meeting of the minds and a contract was formed.

146. The Plaintiff performed work for Mr. Moon and the SparkLabs Group umbrella of accelerator funds, and Defendant's other funds such as its seed funds.

147. (After the Plaintiff discovered the securities fraud at SparkLabs IoT, Mr. Moon and the Plaintiff agreed that the Plaintiff would continue to work in his full-time job, but also across the rest of the SparkLabs accelerator and other funds, GPs, and management companies).

148. The Plaintiff fully performed, by completing all tasks that Mr. Moon requested, other than ones that would require him to break the law (e.g. raising money for tainted, fraudulent funds).

149. The Plaintiff's last day on the job was July 4th, 2019.

150. The salary owing was required by California law to be paid by July 7th, 2019.

151. As calculated in the Plaintiff's labor claim and as explained in the narrative above, Mr. Moon and the SparkLabs Group owe Plaintiff $265,650.68 of unpaid salary, including the Labor Code 203(a) penalty, but not including other applicable penalties, as of July 4th, 2019.

152. Mr. Moon breached the parties' contract by not paying the Plaintiff.

153. The Plaintiff was damaged by Mr. Moon's breach of contract.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

154. Including pre-judgment interest, the Plaintiff has been damaged to the tune of $407,922.83 as of December 7th, 2023.

155. All allegations for this cause of action shall be fully proven at jury trial, as shall the precise amount of damages (including pre-judgment interest owing).

## Count II – Wage Theft

156. The Plaintiff realleges paragraphs 1-141 as if fully set out herein.

157. Bernard Moon and the SparkLabs IoT accelerator fund offered Plaintiff a full-time job in August 2017, with a salary of US $150,000 per year (in writing, by email).

158. The Plaintiff accepted that offer in writing and began work on October 26th, 2017.

159. The Plaintiff performed work for Mr. Moon and the SparkLabs Group umbrella of accelerator funds, and Defendant's other funds such as its seed funds.

160. (After the Plaintiff discovered the securities fraud at SparkLabs IoT, Mr. Moon and the Plaintiff agreed that the Plaintiff would continue to work in his full-time job, but also across the rest of the SparkLabs accelerator and other funds, GPs, and management companies).

161. The Plaintiff's last day on the job was July 4th, 2019.

162. The salary owing was required by California law to be paid by July 7th, 2019.

163. As calculated in the Plaintiff's labor claim and as explained in the narrative above, Mr. Moon and the SparkLabs Group owe Plaintiff $265,650.68 of unpaid salary, including the Labor Code 203(a) penalty, but not including other applicable penalties, as of July 4th, 2019.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

164.    All allegations for this cause of action shall be fully proven at jury trial, as shall the precise amount of damages (plus pre-judgment interest owing).

### Count III – Common Law Fraud

165.    Plaintiff realleges paragraphs 1-141 as if dully set out herein.

166.    The Defendant's attorney made false statements of material fact to the Labor Commissioner and its staff concerning the underlying facts related to the Plaintiff's full-time job with the SparkLabs Group (collectively "the Misrepresentations").

167.    The Misrepresentations were false when made and were known to be false by the Defendant.

168.    The Defendant (the principal) is liable for the tortious acts of his attorney, Mr. Daniel (agent).

169.    The Defendant Mr. Moon intended that the Labor Commissioner and the staff of the Labor Commissioner rely on the Misrepresentations.

170.    The Labor Commissioner and its staff reasonably relied on the Misrepresentations;

171.    The Plaintiff was damaged by the Labor Commissioner's reasonable reliance in not receiving an Order to be paid, the US \$265,650.68 owing (base damages) as of July 4th, 2019, as well as other penalties and prejudgment interest thereon at 10% compounded.

172.    Mr. Moon's Misrepresentation were the proximate cause of the Plaintiff's damages.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

1

2

**Count IV – Breach of Fiduciary Duty**

3

173.    The Plaintiff realleges paragraphs 1-141 as if fully set out herein.

4

5

174.    Alternatively and conjuctively, Moon is a managing shareholder within the meaning of

6

*Sterling v. Mayflower Hotel Corp.*, 93 A.2nd 207, 109-110 (Del. 1952). As such, Moon had

7

fiduciary duties to the Plaintiff to treat him fairly.

8

175.    Moon, as agent for Defendant, has breached his fiduciary duties by denying the Plaintiff just

9

recompense and past, present and future compensation, by lying to the Labor Commissioner to

10

attempt to deny the Plaintiff the salary that he was offered, accepted, and subsequently earned.

11

176.    The Plaintiff has been damaged by Moon's breach of fiduciary duty by not being paid the

12

13

salary he is owed and by being denied the other offered reasonable compensation for his

services, in an amount to be fully proven at jury trial.

14

15

177.    Moon's breaches of fiduciary duty are the proximate cause of the Plaintiff's damages.

16

17

**Count V – Tortious Interference with Contract**

18

19

178.    The Plaintiff realleges paragraphs 1-141 as if fully set out herein.

20

179.    Defendant was fully aware of the contract between the SparkLabs Group IoT and Plaintiff,

21

22

namely for SparkLabs IoT to pay Plaintiff US $150,000 per year for his role as partner and Managing

23

Director of SparkLabs IoT (and later, partner and Managing Director within the SparkLabs Group).

24

25

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;
WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST
ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH &
FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

26

180.    That represented less than 10% of the total compensation expected by Plaintiff, with his 36% ownership of the relevant General Partnership.

181.    The Plaintiff had rights under those contracts and within those partnerships.

182.    Those rights included receiving information sufficient to value and monetize the Plaintiff's equity interests, bestowed as partial incentive for his professional services, belying the assertion that the professional services were gratuitous. Defendant interfered with those rights as well.

183.    Defendant Mr. Moon rendered substantial assistance to SparkLabs IoT and the SparkLabs Group in breaching their contract with Plaintiff by lying repeatedly to the Labor Commissioner (through his attorney).

184.    Defendant Mr. Moon's interference was intentional and without any basis in the law whatsoever.

185.    Defendant Mr. Moon's assistance to SparkLabs IoT and to the SparkLabs Group and interference with the Plaintiff's contracts was a substantial factor in bringing about the Plaintiff's damages which include approximately $265,650.68 due to be paid to the Plaintiff for wages as of July 7th, 2019, plus prejudgment interest, opportunity costs and expectancy damages.

## Count VI – Unjust Enrichment

186.    The Plaintiff realleges paragraphs 1-141 as if fully set out herein.

187.    The Defendant Mr. Moon was enriched by the value of the Plaintiff's services before his role as partners and Managing Director including providing his labor, expertise and intellectual property to the Defendant.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

188.    The Plaintiff was impoverished by the loss of years of his time of professional services as well as the Defendants' exploitation of his expertise and intellectual property.

189.    The Defendants' enrichment and the Plaintiff's impoverishment were directly and inextricably linked.

190.    The Defendant's enrichment and the Plaintiff's ongoing impoverishment have been ongoing from October 26th of 2017 until the Plaintiff's retaliatory discharge in July 4th, 2019.

191.    The Defendant Mr. Moon has no justification for retaining the benefits of the Plaintiff's services, expertise and intellectual property without paying him.

192.    There is no other adequate remedy at law for the Plaintiff.

193.    The Defendant in equity and good conscience should pay the Plaintiff what the Defendant Mr. Moon promised him in writing, the $150,000 per year.

194.    In the alternative, the Defendant Mr. Moon should pay the Plaintiff the reasonable (market) value of his services, expertise and intellectual property as benchmarked by prevailing practice by the Defendant and peer accelerators in an amount to be determined at trial.

195.    In another alternative, Defendant Mr. Moon should pay the Plaintiff based on his former consulting rates.


**Count VII – Breach of Covenant of Good Faith & Fair Dealing**


196.    Plaintiff realleges paragraphs 1-141 as if fully set out herein.


**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

197.    There is, as a matter of California law, a covenant of good faith and fair dealing which prohibits a contract to the party of taking actions that will deprive his counter-party of the benefit of his or her bargain.

198.    Moon breached the Covenant of Good Faith and Fair Dealing in this case by having Mr. Daniel make a series of false statements to the Labor Commissioner. This was an abuse of discretion by Mr. Moon and an action not within the contemplation of the parties at the time the contract of employment was entered into.

199.    It was Moon who made all those statements for the Defendant to submit to the Labor Commissioner.  Indeed, Mr. Daniel is Moon's personal attorney, who Moon asked to represent the Defendant and make said submission to the Labor Commissioner.

200.    Further, the principal (Mr. Moon) is liable for the acts of his agent (attorney Mr. Daniel).

201.    Mr. Moon's series of false statements to the Labor Commissioner was a substantial factor in bringing about the Plaintiff's damages which include approximately $265,650.68 due to be paid to the Plaintiff for wages as of July 4th, 2019 plus prejudgment interest, opportunity costs and expectancy damages.

202.    Indeed, but for Mr. Moon's false statements, the Labor Commissioner would have ordered that the Plaintiff be paid $265,650.68 for wages as of July 4th, 2019 plus prejudgment interest and other amounts and penalties owing.

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

WHEREFORE, PLAINTIFF PRAYS:

(a) As to Count I for an award of damages, in an amount sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendant Mr. Moon's breach of contract.

(b) As to Count II for an award of damages, in an amount sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendant Mr. Moon's wage theft and for the imposition of exemplary damages in an amount sufficient to punish and deter the Defendants from engaging in such acts of bad faith in the future.

(c) As to Count III for all direct and consequential damages the Plaintiff incurred as a proximate result of Mr. Moon's common law fraud along with the imposition of exemplary damages to deter Defendants from committing such acts of fraud in the future;

(d) As to Count IV for all direct and consequential damages the Plaintiff incurred as a result of Mr. Moon's acts of fiduciary breach, along with the imposition of exemplary damages to deter the Defendants from committing such acts of fiduciary breach in the future;

(e) As to Count V, for all direct and consequential damages the Plaintiff incurred as a result of Defendant's tortious interference with the Plaintiff's labor claim as well as for the imposition of exemplary damages to deter Defendant Moon from tortiously interfering with contracts in the future;

(f) As to Count VI, for all direct and consequential damages the Plaintiff incurred as a proximate result of Mr. Moon's unjust enrichment along with the imposition of exemplary damages to deter Mr. Moon from unjustly enriching himself and abusing its power at the expense of others in the future;

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

(g) As to Count VII, for all direct and consequential damages the Plaintiff incurred as a result of Mr. Moon's acts of breaching the covenant of good faith and fair dealing, along with the imposition of exemplary damages to deter the Defendant from committing such acts breaching the covenant of good faith and fair dealing in the future;

(h) For reasonable paralegal's fees and future attorney's fees as well as compensation for the Plaintiff's time in representing himself (*quantum merit*) while he must, and all costs of this action including filing fees, and related travel and service provider costs.

(i) For such other and further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED on December 12th, 2023

_____
CARL A. WESCOTT, *pro se*

## VERIFICATION

I, Carl A. Wescott, under penalties provided by California and Arizona law as well as the federal laws of the United States of America, certify that the facts set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
CARL A. WESCOTT

**VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; WAGE THEFT; COMMON LAW FRAUD; NEGLIGENCE; UNJUST ENRICHMENT; BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; TORTIOUS INTERFERENCE w BUSINESS EXPECTANCY**

Wednesday, February 12th, 2020



Stephanie Avakian, Esq.
Co-Director Division of Enforcement
US Securities and Exchange Commission
100 F. Street, NE
Washington DC 20549

Re: The SparkLabs Group and Bernard Moon
    Fraudulent Inter-Fund Transfers (KF II Fund and SparkLabs IoT Fund)

Dear Director Avakian:

I was a former Managing Director within the SparkLabs Group
(http://www.sparklabsgroup.com/) until my abrupt termination (partially for
being too ethical and lawful) in June of 2019. The purpose of this
communication is to inform you of an ongoing, pervasive, and serious pattern
of securities fraud that has been committed by the SparkLabs Group and its
main partners (especially Bernard Moon) over a period of at least the last
three and a third years. That conduct, by its very nature, is becoming more and
more difficult to effectively disclose and correct.

There are two main types of securities fraud prevalent at the SparkLabs
Group.  This letter is about a Fraudulent Inter-Fund Transfer that was intended
to occur between two funds and is related to many examples of another type
of securities fraud, namely that of false statements to prospective investors
related to securities offerings.  Mr. Moon has also broadcast false statements
about securities offerings to the general public with alarming frequency, many
of which have been published on his blog and on the World Wide Web.  I'll
write a separate letter shortly concerning the second type of securities fraud
that I'm aware of at the SparkLabs Group.

The reason that I am reaching out to your office directly is that as a former
senior executive in the SparkLabs Group I feel a deep ethical responsibility as
well as a fiduciary responsibility to the SparkLabs Group's investors to
elevate this matter. Quite frankly, it is also important for me to support an
already robust record that I have repeatedly sought to report and correct this
practice internally at the SparkLabs Group.

1

My tenacity in this respect has undoubtedly cost me hundreds of thousands in salary (hopefully temporarily) and millions of dollars or more in other expected compensation via investment proceeds and carried interest (General Partnership interests). Indeed, as I am in the process of pressing related claims, I believe it to be absolutely essential to eliminate any inference that my silence is for sale.

By way of executive summary, The SparkLabs Group is a group of related global technology investment funds (venture capital funds, accelerator funds, and seed funds) with management companies in Delaware and a presence in Palo Alto, California (where founding partner Bernard Moon resides).

In Autumn 2017, Bernard Moon made an offer on behalf of the SparkLabs Group recruiting me to be the Managing Director of the SparkLabs IoT Smart City Accelerator Fund (the web site is currently redirecting elsewhere. Here's a snapshot as of 3/24/2019: http://web.archive.org/web/20190324090549/http://www.sparklabsiot.com/en/index.php). The offer included a $150,000 salary and significant General Partnership interests (on the order of 36%). I accepted the offer and began employment on 10/26/2017.

It was my understanding when I was a SparkLabs IoT Smart City Venture Partner (in 2016) that the SparkLabs IoT Smart City Accelerator Fund was going to get on the order of US $1 million per year in grants from the Korean government. I was told that this was because of the SparkLabs Group's exemplary record in job creation in South Korea. President Park Geun-hye was the incumbent President of South Korea at the time the commitment for the grant was made and a big supporter of the Sparklabs Group, making personal visits to the SparkLabs offices.

It's at best unconventional for public money at this order of magnitude to be funding private commercial investment interests. In late October 2016, just after Bernard Moon was trumpeting to the world that SparkLabs IoT was about to open its doors on November 16th, 2016 and make investments in IoT companies (e.g., this 10/19/2016 press release via PRWeb https://www.prweb.com/releases/102016/iot/prweb13772740.htm), President Park was indicted for fraud and abuse of power, and then arrested by South Korean prosecutors on 10/31/2016.

My tenacity in this respect has undoubtedly cost me hundreds of thousands in salary (hopefully temporarily) and millions of dollars or more in other expected compensation via investment proceeds and carried interest (General Partnership interests). Indeed, as I am in the process of pressing related claims, I believe it to be absolutely essential to eliminate any inference that my silence is for sale.

By way of executive summary, The SparkLabs Group is a group of related global technology investment funds (venture capital funds, accelerator funds, and seed funds) with management companies in Delaware and a presence in Palo Alto, California (where founding partner Bernard Moon resides).

In Autumn 2017, Bernard Moon made an offer on behalf of the SparkLabs Group recruiting me to be the Managing Director of the SparkLabs IoT Smart City  Accelerator Fund (the web site is currently redirecting elsewhere. Here's a snapshot as of 3/24/2019: http://web.archive.org/web/20190324090549/http://www.sparklabsiot.com/en/index.php).  The offer included a $150,000 salary and significant General Partnership interests (on the order of 36%).  I accepted the offer and began employment on 10/26/2017.

It was my understanding when I was a SparkLabs IoT Smart City Venture Partner (in 2016) that the SparkLabs IoT Smart City Accelerator Fund was going to get on the order of US $1 million per year in grants from the Korean government.  I was told that this was because of the SparkLabs Group's exemplary record in job creation in South Korea.  President Park Geun-hye was the incumbent President of South Korea at the time the commitment for the grant was made and a big supporter of the Sparklabs Group, making personal visits to the SparkLabs offices.

It's at best unconventional for public money at this order of magnitude to be funding private commercial investment interests.  In late October 2016, just after Bernard Moon was trumpeting to the world that SparkLabs IoT was about to open its doors on November 16th, 2016 and make investments in IoT companies (e.g., this 10/19/2016 press release via PRWeb https://www.prweb.com/releases/102016/iot/prweb13772740.htm), President Park was indicted for fraud and abuse of power, and then arrested by South Korean prosecutors on 10/31/2016.

2

President Park has since been prosecuted for corruption and is serving a jail sentence of 25 years. The anticipated grant did not materialize (my guess is these two facts are related) and the SparkLabs Group, and more specifically the SparkLabs IoT Smart City fund made commitments to invest in some sixteen (16) private companies. Mr. Moon and the SparkLabs Group should have engaged in transparent fund-raising for equity capital for the SparkLabs IoT Smart City accelerator fund, even if that involved some delay. Instead, the SparkLabs Group, under the stewardship of founding partner Bernard Moon, cobbled together a syndicated loan from the existing SparkLabs Korea Fund II to fund SparkLabs IoT fund commitments and terms sheets.

No disclosure about this loan to another fund was made to Korea Fund II investors, nor was approval sought from KF II investors for the sixteen wires which emanated from KF II to fund SparkLabs IoT Smart City accelerator fund investments. It's my understanding that some paperwork was done to take the total amount of the sixteen (16) wires to SparkLabs IoT Smart City companies and make that a loan from KF II to the SparkLabs IoT Smart City accelerator fund, but I've never seen that paperwork. The approximate time frame of those 16 wires was December 2016 to March 2017.

Undaunted, Mr. Moon and the SparkLabs Group had powered forward, announcing to the world the first fourteen (14) companies selected for investment from the SparkLabs IoT Smart City accelerator fund: https://venturebeat.com/2016/11/20/sparklabs-names-14-startups-for-its-internet-of-things-accelerator/. (Two more companies were added later).

KF II funded the investments, but it was the SparkLabs IoT accelerator fund that signed term sheets and definitive investment contracts with the sixteen (16) companies. The SparkLabs IoT Smart City Accelerator Fund received the shares in those sixteen companies. Mr. Moon and SparkLabs continued to represent to the world that the SparkLabs IoT Smart City Accelerator Fund made those investments, including to "portfolio" company Drop, such as here https://hackernoon.com/sparklabs-group-a-new-beginning-cf1e49c7afe7 a year later, August 2017:

But yet, the SparkLabs IoT Smart City accelerator fund never raised a single dollar, with the possible exception (one of semantics) of US $50,000 of my money that I agreed to invest (in 2016) into the entity that had made the 16 investments in those IoT companies, in exchange for 3% of the LP interests of that entity's Limited Partnership. That money was converted and I've received nothing (however, I intend to file a legal complaint).

Despite my stated intention to focus on the commingling and unauthorized inter-fund transfers, I've clearly veered into the territory of false statements related to securities offerings. Allow me to return to the stated area of focus and my opening salvo of commingling.

As you know. Ms. Avakian, investment funds' commingling can be problematic for at least the following reasons:

- The unauthorized transfers are undisclosed to investors;
- They place investor capital at risk without adequate disclosure or compensation (e.g. risk premium);
- They represent a species of self-dealing in which the interests of the SparkLabs Group's partners are paramount and their profits from carried interests are maximized at the expense of investor interests;
- They inevitably confer a corrupting degree of discretion on the SparkLabs Group partners by giving them the practical power to favor one set of investors over another or their own interests over investor interests.

In other words, the SparkLabs Group has adopted the policy of treating the proceeds from discrete and distinct Funds with different time horizons and risk profiles as one slush fund or, if you will, "piggy bank" that can be raided at the sole discretion of the partnership.

Such a regimen is, of course, intuitively unlawful though I am not, in this case, compelled to rely on intuition. I have attached, for your convenient reference, the SEC's complaint against William M. Jordan filed on 5/15/18 ("the Jordan Complaint"). The reason I am attaching the Jordan Complaint is that your colleagues and subordinate set out, in commendable detail, how undisclosed inter-fund transfers create conflicts of interest and run afoul of Rules 17(a) and 10B-5. I respectfully commend your specific attention to paragraphs 103-107.

I was unaware of these issues when first hired by the SparkLabs Group but discovered the truth in December 2017, while meeting with Alex Namkung in Seoul. His departure from the SparkLabs Group earlier in 2017 was related to these issues.

I was in a precarious position as, despite my promised salary, I had not been paid yet (due to the same issue of the SparkLabs IoT Smart City fund having no money and related issues). Nevertheless, I insisted on cleaning things up, making the appropriate disclosures, and starting a new clean fund from scratch. I dealt mainly with Bernard Moon, who hired me. I received assurances from Mr. Moon that the transfers and/or loan would be "cleaned up" although, after having educated myself on the more salient details and points of US securities laws I am now skeptical that such a "clean-up" could have been possible.

As the SEC points out in the Jordan Complaint:

> The offering documents, however, did not disclose either the (a) possibility that investor proceeds would be used to make inter-fund loans or investments; or (b) material conflicts of interest created by Jordan's.

Obviously, as the Jordan Complaint details, the practice of such inter-fund transfers is opaque to investors; any valuations that were floors or ceilings in convertible debt would necessarily be rushed and perhaps rounded up to accommodate SparkLabs Group's partners objectives; and fair consideration for the "loans" would not necessarily be negotiated on an arms-length basis. (Indeed, the SparkLabs Group was the *real* borrower here, not the IoT companies, so we have a borrower intending to unilaterally set and settle the terms of its own loan).

Finally, the temptation would be overwhelming to "game" valuations, risk premiums and paper gains to maximize partner bonuses. The probability that investors would be under-rewarded for risk and that partners would be over-rewarded in the form of carried interest profits is extremely high.

It is also worth mentioning that much of this activity has taken place on the watch of two global powerhouse law firms: first Wilson Sonsini Goodrich & Rosati, and then Cooley LLP.  I'm not sure which bookkeepers, CPAs/accountants, and auditors were asleep at the wheel, too (or possibly worse), but I imagine all these details will become clear in short order.

While lawyers have won more cases than they've lost for securities aiding and abetting offenses, especially since 2008 there are ethical, licensure and regulation issues. <u>Moreover, the US Supreme Court has recently revived aiding and abetting liability to an appreciable extent, in</u> *Lorenzo v. Securities and Exchange Commission*, 587 U.S. ___ (2019).

In any event, it would be a red flag if eminent law firms were to permit such dubious practices or to engage in willful blindness in connection therewith. I respectfully suggest that the Enforcement Division review the work of the involved attorneys, CPAs, and auditors to determine whether they were negligent or even complicit in investor fraud.

I've brought the securities fraud to the attention of not only SparkLabs Group partners, but also Cooley LLP attorneys, who thus far have yet to acknowledge the facts or even investigate my assertions.  Furthermore, in a coverup and bit of revisionist history related to the securities fraud as I was about to be fired (partially for insisting that these issues were fraud and needed to be disclosed and cleaned up), Bernard Moon, in response to a subpoena, eliminated my salary from my offer letter (forgery), and then certified under penalty of perjury that the document was authentic.  Josh Elefant, esq. at Cooley LLP was the attorney at Cooley that submitted the forged document in response to that subpoena.

I've since let Mr. Elefant know about this on multiple occasions and he has not sought any more facts from me, nor corrected the forged documents in response to the subpoena.  It appears to me that Mr. Elefant and Cooley LLP were and are aiding and abetting the securities fraud by Mr. Moon and other parties, as well as other potential crimes as part of a coverup of my firing (without receiving pay) and the securities fraud.

I would, of course, be pleased to cooperate in any investigation you choose to inaugurate. I would have liked to provide you with primary source documents as part of this letter, but I was cut off from my SparkLabs email and access to the SparkLabs online system with no notice as part of my abrupt and retaliatory termination.

However, my memory of what transpired is fairly clear and will soon be supported with documentation obtained in discovery in my legal complaint. Further, I am willing to testify under penalty of perjury as to the events that have occurred to the best of my recollection, knowledge, and belief, both for any investigation and if necessary, for any future trial.

When I obtain the needed source documents in discovery in my legal complaint, I'll supply them to your office.

Thank you for your time and engagement in reviewing this matter and considering the points offered in this summary. Please feel free to contact me or have your staff contact me at any time.

Sincerely

Carl A. Wescott
+1 415 335 5000
Carlwescott2020@gmail.com

## Fwd: Managing Parter Role for SparkLabs IoT


(Exhibit C)

---------- Forwarded message --------
From: **Bernard Moon** <bernard@sparklabsglobal.com>
Date: Tue, Aug 8, 2017 at 2:22 AM
Subject: Managing Parter Role for SparkLabs IoT
To: Carl A. Wescott <C@carlawescott.com>

Carl,

It would be awesome if you would come on board as the Managing Partner for SparkLabs IoT.  I already discuss this with Jimmy and Eugene, and will soon with HanJoo but we know that he will agree.  At this time, I would be discrete and not disclose to Alex when you see him next week.  Unless Eugene informs you otherwise.

Your salary I assume will be at least $150,000/year.  Small at a minimum, but can increase depending on the amount that is raised and what we plan for the yearly budget.

As for your carried interest, this is the confidential but original allocation:

  10.0% Jimmy
  10.0% Bernard
  10.0% HanJoo
  10.0% Eugene
  10.0% Jay
  10.0% Frank
  10.0% Net
   7.0% Engineer Director (not fille
   9.0% Alex
   1.0% Associate (not filled)
   1.00% Operations Manager (not filled)
   3.0% Jeff Guo
   3.0% Carl Wescott
   3.0% Charles Huang
   3.0% Kai Huang
**100.0%**

We want to credit Alex with some of his carry for the 1st year, so we will let him retain 3% vs. 9%.  I assume you basically don't need an engineering director.  Maybe you might need a junior or mid-level hardware engineer, so you might have to allocate him some of your carry.  We can discuss if things need to be shifted around.  Here is the new carry distribution with you getting 37%:

   37.0% Carl Wescott
    7.0% Jimmy

7.0%  HanJoo
7.0%  Eugene
7.0%  Jay
7.0%  Frank
7.0%  Net
3.0%  Alex
1.0%  Associate (not filled)
1.0%  Operations Manager (not filled)
3.0%  Jeff Guo
3.0%  Charles Huang
3.0%  Kai Huang
**100.0%**

As you know, this is the carry allocation for the 20% profit we will receive after all the principal is paid back.  Let me know if you have any questions and I'll see you soon.  Thanks!

Bernard

1  COOLEY LLP
   LESLIE V. CANCEL (160652)
2  (LCANCEL@COOLEY.COM)
   JOSHUA E. ELEFANT (312913)
3  (JELEFANT@COOLEY.COM)
   3175 Hanover Street
4  Palo Alto, CA  94304-1130
   Telephone:   (650) 843-5000
5  Facsimile:   (650) 849-7400

6  Attorneys for Third Party
   SPARKLABS MANAGEMENT, LLC
7

(EXHIBIT D)

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                     COUNTY OF SAN FRANCISCO

10

11

12  CARL A. WESCOTT,                    No. FDI-14-781666

13              Petitioner,             DECLARATION OF RECORDS
                                        CUSTODIAN
14       v.

15  MONETTE R. STEPHENS,

16              Respondent.

17

18

19  I, Bernard Moon, certify and declare as follows:

20       1.  I am over the age of 18 years and not a party to this action.

21       2.  My business address is 9587 Lupine Avenue, Palo Alto, CA 94303.

22       3.  I am Manager at both SparkLabs Management, LLC ("SparkLabs") and SparkLabs

23  Global Ventures Management, LLC.

24       4.  I am the duly authorized custodian of the following described business records:

25  documents concerning the terms and conditions of SparkLabs' actual or potential future

26  engagement of Mr. Carl A. Wescott as a service provider and documents relating to any

27  compensation that Mr. Wescott may be entitled to receive as part of his relationship with

28  SparkLabs.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

200548026 v1                              1.

DECLARATION OF RECORDS CUSTODIAN FDI-14-781666

1       5. The copies provided are true copies of all the records responsive to the subpoena,

2  subject to SparkLabs' reasonable limitation with respect to scope, except for the confidential

3  information that has been redacted.

4       6. The Documents transmitted herewith are copies of business records and were

5  prepared by the personnel of SparkLabs in the ordinary course of business at or near the time of the

6  act, condition, or event.

7

8      I declare under penalty of perjury under the laws of the State of California that the foregoing

9  is true and correct and that this Declaration is executed on March 18, 2019 at Palo Alto, California.

10

11

12                                         _____

13                                     BERNARD MOON

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

200548026 v1                              2.

DECLARATION OF CUSTODIAN OF RECORDS FDI-14-781666

1   COOLEY LLP
    LESLIE V. CANCEL (160652)
2   (LCANCEL@COOLEY.COM)
    JOSHUA E. ELEFANT (312913)
3   (JELEFANT@COOLEY.COM)
    3175 Hanover Street
4   Palo Alto, CA 94304-1130
    Telephone:   (650) 843-5000
5   Facsimile:   (650) 849-7400

6   Attorneys for Third Party
    SPARKLABS MANAGEMENT, LLC

7

8                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                            COUNTY OF SAN FRANCISCO

10

11

12  CARL A. WESCOTT,                       No. FDI-14-781666

13              Petitioner,                **THIRD-PARTY SPARKLABS
                                           MANAGEMENT LLC'S
14       v.                                OBJECTIONS AND RESPONSE TO
                                           DEPOSITION SUBPOENA FOR
15  MONETTE R. STEPHENS,                   PRODUCTION OF BUSINESS
                                           RECORDS TO SPARKLABS
16              Respondent.                GLOBAL VENTURES
                                           MANAGEMENT, LLC**
17

18

19          Pursuant to California Code of Civil Procedure sections 2020.010 *et seq.*, Third-Party

20  SparkLabs Management, LLC ("SparkLabs") hereby responds to Respondent Monette Stephens'

21  ("Respondent") February 5, 2019 Deposition Subpoena for Production of Business Records

22  ("Subpoena") served on the custodian of records for SparkLabs Global Ventures Management,

23  LLC.

24  I.   GENERAL RESPONSE.

25          1.    SparkLabs' response to the Requests is made to the best of SparkLabs' present

26  knowledge, information, and belief. This response is at all times subject to such additional or

27  different information that discovery or further investigation may disclose and, while based on the

28  present state of SparkLabs' recollection, is subject to such refreshing of recollection, and such

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

200514491 v1                                       1.

THIRD-PARTY OBJECTION AND RESPONSE TO DEPOSITION SUBPOENA FOR BUSINESS
RECORDS FDI-14-781666

1    additional knowledge of facts, as may result from SparkLabs' further discovery or investigation.

2    SparkLabs reserves the right but assumes no responsibility to conduct further investigation or

3    discovery.

4      2.     SparkLabs will not produce documents or materials that SparkLabs deems to

5    embody material that is private, business confidential, proprietary, trade secret, or otherwise

6    protected from disclosure pursuant to California Constitution, article I, section 1, or California

7    Evidence Code section 1060. Under appropriate circumstances, SparkLabs may agree to produce

8    such documents upon the entry of, and subject to, an appropriate protective order against the

9    unauthorized use or disclosure of such information.

10      3.     SparkLabs reserves all objections or other questions as to the competency,

11    relevance, materiality, privilege or admissibility as evidence in any subsequent proceeding in or

12    trial of this or any other action for any purpose whatsoever of this response and any document or

13    thing produced in response to the Requests.

14      4.     SparkLabs reserves the right to object on any ground at any time to such other or

15    supplemental demands for production as Respondent may at any time propound involving or

16    relating to the subject matter of this Subpoena.

17    II.     GENERAL OBJECTIONS.

18      SparkLabs makes the following general objections, whether or not separately set forth in

19    response to each and every instruction, definition, and document demand made in Plaintiff's

20    Subpoena:

21      1.     SparkLabs objects generally to all Definitions, Instructions, and Requests inclusive,

22    insofar as each such request seeks production of documents or information protected by the

23    attorney-client privilege, the work product doctrine, or the right of privacy under the California

24    Constitution, article I, section 1. Such documents or information shall not be produced in response

25    to any of the Requests and any inadvertent production thereof shall not be deemed a waiver of any

26    privilege or right with respect to such documents or information or of any work product doctrine

27    that may attach thereto.

28      2.     SparkLabs objects to the Subpoena to the extent it contains Requests duplicative of

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

200514491 v1

2.

1    document requests previously served on parties to the litigation.

2    **3.**    SparkLabs objects to all Definitions, Instructions, and Requests inclusive, to the

3    extent they purport to enlarge, expand, or alter in any way the plain meaning and scope of any

4    specific demand on the ground that such enlargement, expansion, or alteration renders said demand

5    vague, ambiguous, unintelligible, unduly broad, and uncertain.

6    **4.**    SparkLabs objects to all Definitions, Instructions, and Requests inclusive,  to the

7    extent they seek documents not currently in SparkLabs' possession, custody or control, or refer to

8    persons, entities or events not known to SparkLabs, on the grounds that such instructions,

9    definitions, or demands seek to require more of SparkLabs than any obligation imposed by law,

10    would subject SparkLabs to unreasonable and undue annoyance, oppression, burden, and expense,

11    and would seek to impose upon SparkLabs an obligation to investigate or discover information or

12    materials from third parties or services who are equally accessible to the parties to the action.

13    **5.**    SparkLabs objects to all Requests to the extent the requested information is available

14    publicly and/or available through the parties to the litigation.

15    **6.**    SparkLabs objects to all Definitions, Instructions, and Document Requests in which

16    the phrases "REFERRING," "RELATING TO," or "EVIDENCING" appears.    The phrases

17    "REFERRING," "RELATING TO," or "EVIDENCING" are overly broad, vague, ambiguous, and

18    unintelligible, require subjective judgment on the part of SparkLabs and SparkLabs' attorneys, and

19    would require a conclusion or opinion of counsel in violation of the attorney work product doctrine.

20    **7.**    SparkLabs objects to all definitions, instructions, and document requests in the

21    Requests to the extent that they call for the production of "all" documents or things where a

22    reasonable quantity of documents would suffice to show the pertinent information requested.  To

23    the extent that SparkLabs agrees to produce documents in response to a Request seeking "all"

24    documents related to or reflecting certain information, SparkLabs will only produce documents

25    sufficient to show the pertinent information requested.

26    **8.**    SparkLabs objects to the use of the term "DOCUMENT(S)," and to each request

27    containing that term, on the grounds that the term is overbroad, vague, ambiguous, and seeks to

28    impose an undue burden on SparkLabs.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

200514491 v1

3.

THIRD-PARTY OBJECTION AND RESPONSE TO DEPOSITION SUBPOENA FOR BUSINESS
RECORDS FDI-14-781666

III.    SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT DEMANDS.

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into each of the following responses to the extent applicable, SparkLabs responds to the specific demands of Respondent's Subpoena as follows:

REQUEST FOR PRODUCTION NO. 1:

Any and all documents referring and/or relating to CARL ALEXANDER WESCOTT, DOB: 06/15/1967, SSN: [REDACTED], for the time period beginning 1/1/2016 through the date of production.

SPECIFIC OBJECTIONS TO REQUEST FOR PRODUCTION NO. 1:

SparkLabs incorporates its General Responses and General Objections in response to this request. SparkLabs objects: (1) to the phrases "documents", "referring", and "relating to", as overbroad, vague, and ambiguous; (2) that the request is unintelligible to the extent it does not include definitions of the terms "referring" and "relating"; (3) on the grounds that the Request seeks information that is confidential, sensitive, or private in nature, including confidential business information, or would otherwise invade the privacy rights of third parties; (4) to the extent the Request seeks information that is protected by the attorney-client privilege and/or attorney work product doctrine; and (5) on the grounds that the Request is overbroad, unduly burdensome, oppressive, and harassing insomuch as it is disproportionate to the needs of the case and to the extent that it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving any objections, SparkLabs answers as follows: SparkLabs shall produce any and all documents concerning the terms and conditions of SparkLabs' actual or potential future engagement of Mr. Wescott as a service provider, subject to redaction of confidential and private information of SparkLabs and other third parties.

REQUEST FOR PRODUCTION NO. 2:

Any and all documents evidencing any remuneration, including but not limited to consulting fees, returns on investment, dividends, stocks, stock options, and any other forms of remuneration/compensation, to which CARL ALEXANDER WESCOTT, DOB: 06/15/1967, SSN:

200514491 v1

4.

1    [REDACTED] is entitled from 1/1/2016 through the date of production.

2    SPECIFIC OBJECTIONS TO REQUEST FOR PRODUCTION NO. 2:

3         SparkLabs incorporates its General Responses and General Objections in response to this

4    request.  SparkLabs objects:  (1) to the phrases "documents", "evidencing", "remuneration",

5    "consulting fees", "returns on investment", and "other forms of remuneration/compensation", as

6    overbroad, vague, and ambiguous; (2) that the request is unintelligible to the extent it does not

7    include definitions of the term "evidencing"; (3) on the grounds that the Request seeks information

8    that is confidential, sensitive, or private in nature, including confidential business information, or

9    would otherwise invade the privacy rights of third parties; (4) to the extent the Request seeks

10   information that is protected by the attorney-client privilege and/or attorney work product doctrine;

11   and (5) on the grounds that the Request is overbroad, unduly burdensome, oppressive, and harassing

12   insomuch as it is disproportionate to the needs of the case and to the extent that it seeks information

13   that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

14        Subject to and without waiving the foregoing objections, SparkLabs responds as follows:

15   SparkLabs will produce all documents related to any compensation that Mr. Wescott may be

16   entitled to in the future as part of his relationship with SparkLabs.  Mr. Wescott is not currently

17   entitled to, and is not currently receiving, any remuneration from SparkLabs.

18

19   Dated:       March 21, 2019

20                                        COOLEY LLP
                                         LESLIE V. CANCEL (160652)
21                                       JOSHUA E. ELEFANT (312913)

22

23                                  By: _____
                                         Joshua E. Elefant (312913)
24
                                         Attorneys for Third-Party
25                                       SPARKLABS MANAGEMENT, LLC

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

THIRD-PARTY OBJECTION AND RESPONSE TO DEPOSITION SUBPOENA FOR BUSINESS
RECORDS FDI-14-781666



SPARKLABS000001

From: Bernard Moon <bernard@sparklabsglobal.com>
Date: Tue, Aug 8, 2017 at 2:22 AM

Subject: Managing Parter Role for SparkLabs IoT

To: "Carl A. Wescott" <C@carlawescott.com>

Carl,

It would be awesome if you would come on board as the Managing Partner for SparkLabs IoT. I already discuss this with  and ▓▓, and will soon with ▓▓ but we know that he will agree. At this time, I would be discrete and not disclose to ▓▓ when you see him next week. Unless ▓▓ informs you otherwise.

As for your carried interest, this is the confidential but original allocation:



100.0%

We want to credit ▮ with some of his carry for the 1st year, so we will let him retain ▮% vs. ▮%. I assume you basically don't need an engineering director. Maybe you might need a junior or mid-level hardware engineer, so you might have to allocate him some of your carry. We can discuss if things need to be shifted around. Here is the new carry distribution with you getting 37%:



37.0% | Carl Wescott

100.0%

As you know, this is the carry allocation for the 20% profit we will receive after all the principal is paid back. Let me know if you have any questions and I'll see you soon. Thanks!

SPARKLADS000003

Bernard

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

4

SPARKLABS000004



--------- Forwarded message ---------
From: Bernard Moon <bernard@sparklabsglobal.com>
Date: Sun, Nov 11, 2018 at 5:44 PM
Subject: Carried Interest Changes for SparkLabs IoT
To: Carl Wescott <carl@sparklabsiot.com>
Cc: eugene <eugene@sparklabs.co.kr>

So I lowered the founding partners from ▮% to ▮%. Lowered Carl & Team from 44% to 42%. Then allocated ▮% to ▮, which hopefully they will accept.

Some other minor changes, such as allocating ▮% for the advisors since I think it's better for them to feel appreciated. Let me know if you are good with this. Thanks!

Bernard



42.0% Carl Wescott & Team

SPARKLAES000005

SPARKLABS000006

2



100.0%

**PROOF OF SERVICE**

I am a citizen of the United States and a resident of the State of California. I am employed in Santa Clara County, State of California, in the office of a member of the bar of this Court, at whose direction the service was made. I am over the age of 18 years and not a party to this action. My business address is Cooley LLP, 3175 Hanover Street, Palo Alto, California 94304-1130. My e-mail address is dprocedo@cooley.com@cooley.com. On March 21, 2019, I served the following documents on the parties listed below in the manner(s) indicated:

THIRD-PARTY SPARKLABS MANAGEMENT LLC'S OBJECTIONS AND RESPONSE TO DEPOSITION SUBPOENA FOR PRODUCTION OF BUSINESS RECORDS TO SPARKLABS GLOBAL VENTURES MANAGEMENT, LLC(S)

☐  (BY U.S. MAIL – CCP § 1013a(1)) I am familiar with the business practice of Cooley LLP for collection and processing of correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☐  (BY MESSENGER SERVICE – CCP § 1011) I consigned the document(s) to an authorized courier and/or process server for hand delivery on this date.

☐  (BY FACSIMILE – CCP § 1013(e)) I am personally and readily familiar with the business practice of Cooley LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☒  (BY OVERNIGHT MAIL – CCP § 1013(c)) I am personally and readily familiar with the business practice of Cooley LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by _____ for overnight delivery.

☒  (BY ELECTRONIC MAIL – CCP § 1010.6(a)(4)(A)) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused such documents described herein to be sent to the persons at the e-mail addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Hannah R. Salassi
Lvovich & Szucsko, P.C.
50 Osgood Place, Suite 500
San Francisco, CA 94133
hannah@landslawgroup.com

1    I declare under penalty of perjury under the laws of the State of California that the above is

2    true and correct.

3    Executed on March 21, 2019, at Palo Alto, California.

Debra L. Procedo

February 19th, 2020                    Exhibit E

Chief Robert Jonsen
Palo Alto Police Department
275 Forest Avenue
Palo Alto California 94301

Re:  Bernard Moon, the SparkLabs Group, letter 2 of 4 (followup to emails of late 2019)

Dear Chief Jonsen:

The purpose of this communication is to alert you to two related sets of crimes committed by Bernard Moon ("Moon"), senior founding partner of The Spark Labs Group ("SLG") and possibly aided and abetted by attorneys at Cooley, LLP.

Moon, in responding to a subpoena from my ex-wife, altered a document that was represented to be true and accurate copy of correspondence to me. The purpose of the alteration was to delete a $150K salary offer which Moon intended to conceal after I discovered securities fraud at the firm, insisted on cleanup and disclosure of the fraud, and was fired in retaliation.

(I've whistleblown and reported the securities fraud to the SEC, to the California State Attorney General, and now am providing that information to local law enforcement).

I reported the forgery and perjury to the Palo Alto police in August or September last year and was helped by a nice policewoman named Laura (I forget her last name).  However, she informed me that I would have to come to the police station in person to further report.  (I now live in Dubai so it's a bit of a trek, but I'll come in person in March if that's still necessary).

I am not a criminal law specialist, but I now believe that there may be a more broad set of crimes involving Bernard Moon, and hard though it may be to believe, a Cooley LLP attorney, Mr. Josh Elefant, besides the securities fraud that I discovered – which I've also reported to the SEC, the California Attorney General, and now would like to report to your police department.

1. **Statutory Predicates**

In altering the document, I believe Mr. Moon violated the following sections of the California Penal Code:

(a) PC 470 prohibiting forgery;

(b) PC 132 & 134, prohibiting the creation and submission of false evidence to a Court;

(c) PC 529 prohibiting false personation, e.g.:

(2) Verifies, publishes, acknowledges, or proves, in the name of another person, **any written instrument, with intent that the same may be recorded, delivered, or used as true.**

(3) **Does any other act whereby, if done by the person falsely personated, he might, in any event, become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture, or penalty,** or whereby any benefit might accrue to the party personating, or to any other person.

(d) PC 530.5 prohibiting the use of personal information to commit fraud (per 530.55 "personal information" includes name and address) -- **this violation in turn authorizes me to request an investigation by a law enforcement agency having jurisdiction over Bernard Moon, the SparkLabs Group, Josh Elefant, and Cooley LLP (all based in Palo Alto) which I am hereby doing.**

You would be keenly aware that Palo Alto (like your previous jurisdiction, Menlo Park) is a global center of technology finance. While you might expect state, federal, or international agencies to take the lead in combating complex financial crimes, this is a case in which a serious financial fraudster has committed -- rather clumsily -- easily provable and quite serious "blue collar" crimes in aid of covering up international securities fraud. I respectfully submit that the sheer scale and gravity of Moon's global criminal activity warrants a laser focus on the quotidian local offenses that I will describe in here. Of course, I have a statutory right pursuant to 530.6 to request an investigation but I am trying to provide you with the necessary context to inform the level of priority and urgency that you may choose to give to this matter.

## 2. Factual Background

By way of executive summary:

- Bernard Moon is one of the three original founding partners in the SparkLabs Group, a group of more than two dozen seeds funds, venture funds, and accelerator funds, some domiciled or operated from Palo Alto, where Bernard Moon also resides (3587 Lupine Avenue).
- I am a former SparkLabs Group Managing Director.
- Moon and certain colleagues engaged in a series of unlawful and fraudulent inter-fund transfers ("the Transfers") that were not properly disclosed to investors. Specifically, KF II (Korea Fund II) funded sixteen (16) investments in SparkLabs IoT companies.
- I questioned the propriety of the Transfers and was first promised that they and other issues would be cleaned up and properly disclosed. However, I was later terminated in retaliation for my protests against this and certain other unlawful actions taken by Moon (June 2019).
- In the weeks before my termination my ex-wife subpoenaed SparkLabs to determine whether I was receiving compensation -- I had been promised a substantial salary as well as carried interests and general partner interests but these had never been paid over a period of over eighteen+ months;
- Bernard Moon continued to ask to defer my salary, a violation of California Labor law, but I had little choice but to agree, as I was in a vulnerable position.

2

- Without my knowledge or consent, at some point in May of 2019, Moon altered and forged my August 2017 Offer Letter to delete a reference to my US $150K salary -- attorney Joshua Elefant of Cooley LLP transmitted the fraudulently altered documents in response to my ex-wife's subpoena;.

Moon created a document that purported to be correspondence to me, utilizing my personal information, in an attempt to defraud me and others. This violates PC 530.50 as well as myriad related statutes.

This is a serious crime, but it is not a particularly clever crime. Frankly, this is Moon's MO. He commits serious, serial crimes sloppily. The alteration is crude and may be readily proven. The Transfers were improvised hastily -- when a suspicious grant for US $1 million per year offered by now-jailed former President of South Korea (Ms. Park Guen-hye, serving 25 years for corruption) failed to materialize. The Transfers were unlawful because discrete investment funds may not be treated by fiduciaries as unitary piggy-banks, to have the proceeds distributed in whatever manner maximizes SparkLabs' carried interest. I'll send you more information on the inter-fund transfers from KF II to sixteen SparkLabs IoT companies, which violate securities laws.

Cooley attorney Elefant aided, abetted and enabled the document fraud and the securities fraud. I'll provide more information on that shortly, too. Cooley LLP has a resident office in Palo Alto where Mr. Elefant's office is.

### 3. Conclusion

I hope you can appreciate how these crimes would not be easily reducible to an online department template that contemplates -- understandably -- burglaries and bounced cheques. I also apologize if it seems presumptuous to start at the top, I respect both the value of your time and the breadth of your experience.

However, millions upon millions of investor dollars are at risk. My part of this is small, but I still have millions of dollars or more on the line here, too, including unpaid salary (only $225k or so) and other compensation. The easily-provable facts remain that Bernard Moon, a Palo Alto resident, misused my personal information to commit a fraud, encompassing several felonies.

Even if he is not an especially sophisticated criminal, Moon is a highly sophisticated individual. He has been expensively, if not skillfully represented to date. He will remain a menace and will cause harm to others, including further harm to SparkLabs investors, including prominent ones in the Palo Also area, until he is checked by authority.

Of course, I will cooperate in any way with your investigation and I thank you and your staff in advance for their diligent attention to these serious offenses.

Carl A. Wescott

3

June 18th, 2020                

Labor Commissioner
State of California
Department of Industrial Relations
Division of Labor Standards Enforcement

455 Golden Gate Ave.,
10th Floor
San Francisco, CA 94102

(415) 703-5300
LaborComm.WCA.SFO@dir.ca.gov

Dear Labor Commissioner:

This brief letter accompanies my DLSE Form 1 (Wage Adjudication) with further answers to the
questions on the Initial Claim or Form.

First, a few details to set the context. I was offered a job in email by Bernard Moon in August
2017 on behalf of the SparkLabs Group http://www.sparklabsgroup.com/, with a $150,000 salary.
I accepted the offer (including of the $150k salary) and started work on 10/26/2017.

My job title was Managing Director (sometimes Managing Partner), and what I was managing
on behalf of the SparkLabs Group was the SparkLabs Smart City and IoT Fund
https://web.archive.org/web/20190424055458/http://www.sparklabsiot.com:80/en/index.php

Despite the international nature of the group of SparkLabs entities (which also had many
Delaware management companies as well as dozens of Cayman Island funds), I worked in
California (at home in San Francisco), and my boss, Bernard Moon, worked in Palo Alto,
California. Mr. Moon and I were California residents for the entire relevant period. There are
some SparkLabs entities in California, too, which are domiciled at Bernard Moon's house in Palo
Alto.

As hard as it is for even me to believe this now, though I was a full-time employee, and an
officer of the SparkLabs Group (and in particular the entities related to the IoT fund, and also the
SparkLabs Nordics fund, where I was on the investment committee), I was never paid my salary.

I was in a vulnerable position before I accepted the position (homeless and on food stamps),
which also made this situation more egregious. My expenses for a lot of travel and hotels were
reimbursed, which helped me to survive.

I realize this is just the initial report of claim, so for now, here is a high level summary of what
occurred in bulletpoint form (chronologically):

- In early December 2017, I discovered securities fraud at SparkLabs. More specifically, I discovered that the accelerator fund that I was supposed to be managing, SparkLabs Smart City and IoT Fund ("SparkLabs IoT" for short), which was supposed to have made 16 investments in IoT companies already (as per https://hackernoon.com/sparklabs-group-a-new-beginning-cf1e49c7afe7), had not raised money (contrary to Bernard Moon's claims), and had not made those 16 investments. (Another fund, Korea Fund, II, had made the 16 investments).
- I insisted that the securities fraud be cleaned up.
- In late December 2017, I had dinner with Bernard Moon. My salary had not been paid yet.
- At the dinner, Bernard Moon was talking about setting up a California entity and payroll for me but wanted to delay setting up the California entity until January 2018.
- In January 2018, Bernard Moon told me that the SparkLabs Group (which consists of dozens of entities; see Exhibit C for a partial list) had been growing too fast, and didn't have the money to pay me.
- Jumping forward, in 2018 and beyond I helped "clean up" some aspects of the securities fraud. (Incidentally, I've reported the securities fraud to the DBO, the SEC, the California Attorney General, and law enforcement).
- More specifically, since SparkLabs IoT did not make the investments that Bernard Moon claimed it did, I worked with the 16 portfolio companies to correct their records and change their capitalization tables and shareholder agreements to reflect the truth, which is that Korea Fund II was their investor, not SparkLabs IoT.
- The excuses about SparkLabs not having money to pay my salary, and promises to pay, continued in to 2019.
- I continued to insist on disclosure to the world about the false statements to investors and to the general public.
- I then discovered that SparkLabs regularly participated in another type of securities fraud, namely undisclosed, unapproved inter-fund transfers and inter-fund loans.
- Tension between Mr. Moon and I increased as I continued to insist on cleanup.
- I believe I was fired largely in retaliation for insisting on the securities fraud cleanup (which I've reported).
- On June 20th, 2019 Bernard Moon sent me an email firing me.
- I read the email on June 21st, 2019.
- However, I was due to travel to South Korea on June 23rd, 2019 for 10 days on SparkLabs business. SparkLabs had purchased a roundtrip ticket to Seoul for me already (returning July 4th, 2019), and had paid for my hotel rooms in advance.
- As part of the SparkLabs business, I was supposed to attend various events and functions. I was also supposed to work with Dr. Kevin Jo, the founder of a SparkLabs portfolio company, Augmented Knowledge https://www.augmentedk.com/eng/main/index.html.
- I was also scheduled to make a speech on entrepreneurship on behalf of SparkLabs at Inha University in late June.
- Therefore, I went to Seoul from June 23rd, 2019 to July 4th and did my best to fulfill my SparkLabs obligations.

- Hence, despite my firing via an email written on June 20th, 2019 which I read and knew about on June 21st, 2019, I think it's reasonable to consider July 4th, 2019 as my last day of employment at SparkLabs.

Now, let me briefly address a few items on the DLSE Form.

Preliminary questions

I believe I was fired largely in retaliation for insisting on securities fraud cleanup, but that's different than the other types of retaliation on DLSE Form 5 (so I didn't fill out that form).

Part 3: Employer Information

20. SparkLabs IoT was and is an accelerator fund, like Y Combinator. The SparkLabs Group (quoting directly from the web site at www.sparklabsgroup.com) "comprises of SparkLabs accelerator network, Asia's premier startup accelerators... and SparkLabs Capital, a late stage investment vehicle." At this point, the SparkLabs Group has invested in more than 300 portfolio companies.

21. I was an officer and the Managing Director of the fund. I was asked to play various other roles and participate in activities befitting an officer of a venture capital or accelerator fund, including assisting portfolio companies, creating fund documents, sourcing deal flow, analyzing investment opportunities, and speaking to the general public at conferences on behalf of SparkLabs (often in front of thousands of people)

24. I'll provide a list of dozens of SparkLabs entities in California, Delaware, the Cayman Islands, and elsewhere. To my knowledge, Bernard Moon never set up the California entity which would be a subsidiary and which he said he would run my payroll through.

Part 4: Final Wages

29a. I was never paid my promised salary. My expense reimbursements were usually paid to me via Paypal.

Part 7: Wages, Compensation, & Penalties Owed

I listed the most conservative date on the DLSE, 6/20/2019, the date Mr. Moon emailed me that I was fired.

However, I did not read the email and know I was fired until June 21st, 2019.

And, as per the above, since I was leaving for Seoul on SparkLabs business on June 23rd, 2019, with a purchased roundtrip ticket and hotel reservations made and paid for, and since various people were expecting me in Seoul, including people at conferences and at a talk I was scheduled to give at Inha University, I went on the trip and completed my SparkLabs business to the best of

my ability. I flew back on July 4th, and thus I believe July 4th, 2019 may be a more appropriate date for my last day as a full-time employee and officer of the SparkLabs Group.

I listed the most conservative possible date, June 20th, 2019 as my last day of full-time employment, but I've taken the liberty of building this table with the calculations for my owed salary for my full-time employment using the three most likely final day:

| Last Day as FT Employee | 6/20/2019 | 6/21/2019 | 7/4/2019 |
|---|---|---|---|
| First Day Full-Time Empl. | 10/26/2017 | 10/26/2017 | 10/26/2017 |
| Number Days Employed | 602 | 603 | 616 |
| Wages/Salary Owed | $247,397.26 | $247,808.22 | $253,150.68 |

I calculated using the assumption of a 365 day year.

Based on California Labor Code 203(a), I believe the employer is required to pay me for an additional month (30 days), having not paid me, and thus, here are the calculations including the Labor Code 203(a) penalties.

| Last Day as FT Employee | 6/20/2019 | 6/21/2019 | 7/4/2019 |
|---|---|---|---|
| First Day Full-Time Empl. | 10/26/2017 | 10/26/2017 | 10/26/2017 |
| Number Days Employed | 602 | 603 | 616 |
| Wages/Salary Owed | $247,397.26 | $247,808.22 | $253,150.68 |
| Labor Code 203(a) penalty | $12,500.00 | $12,500.00 | $12,500.00 |
| Total Wages/Salary owed | $259,897.26 | $260,308.22 | $265,650.68 |

My salary of US $150,000 works out to $12,500 per month.

There may be more penalties in the Labor Code and California law that I am unaware of that may apply to a California fulltime employee with a California employer in a situation as egregious as mine.

Thank you for your time and consideration.

Carl A. Wescott
3016 Del Ray Street
San Mateo, CA 94403
(415) 335 5000

PRINT YOUR NAME: Carl A. Wescott

## Part 4: FINAL WAGES / BOUNCED CHECKS

| 25. DATE OF HIRE | 26. Check which box applies to you: |
|---|---|
| 10 /26 /2017<br>Month  Day  Year | ☐ Still working for employer  ☐ QUIT on ___/___/___ Month Day Year  ☐ DISCHARGED on ___/___/___ Month Day Year |
| | ☒ Other (specify): fired by email 6/20/2019 which I read 6/21/2019 (my view of last day 7/4/2019) |

| 27a. If you QUIT, did you give 72 hours notice before quitting?<br>☐ YES    N/A<br>☐ NO | 27b. If you QUIT, have you received your final payment of wages including all wages owed?<br>☐ YES, on: ___/___/___ Month Day Year    N/A<br>☐ NO |
|---|---|

28. If you were DISCHARGED, have you received your final payment of wages including all wages owed?

☐ YES, on: ___/___/___ Month Day Year    *I have not*

☒ NO

| 29a. How were your wages paid?<br>☐ BY CHECK  ☐ BY CASH  ☐ BY BOTH CASH & CHECK<br>☐ OTHER: see attached | 29b. If paid by check, did any of your paychecks "bounce" (for example, paycheck could not be cashed because employer has insufficient funds)?    N/A<br>☐ YES        ☐ NO |
|---|---|

## Part 5: HOURS YOU TYPICALLY WORKED

30. Check which box applies: ☒ My work hours and days of work were usually the same each week that I worked.  *(40+ hours per week)*

☐ My work hours and/or days of work varied per week or were irregular. If you checked this box and you are claiming unpaid wages or meal and rest period violations, you should also fill out and submit the DLSE FORM 55.

31. If your work hours and days of work were usually the same each week, give your BEST ESTIMATE below of the hours you usually worked and any time you took for a duty-free meal period during your TYPICAL workweek. DO NOT fill this out if your work hours were too irregular to estimate a typical or average workweek (instead fill out the DLSE Form 55).

| | TIME WORK STARTED | TIME WORK ENDED | 1st MEAL START TIME (If applicable) | 1st MEAL END TIME (If applicable) | 2nd MEAL START TIME (If applicable) | 2nd MEAL END TIME (If applicable) | ONLY IF YOU WORKED A SPLIT SHIFT | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 1st shift ended at | 2nd shift started at |
| DAY 1 of your workweek: | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm |
| DAY 2 of your workweek: | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm |
| DAY 3 of your workweek: | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm |
| DAY 4 of your workweek: | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm |
| DAY 5 of your workweek: | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm |
| DAY 6 of your workweek: | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm |
| DAY 7 of your workweek: | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm |

## Part 6: PAYMENT OF WAGES

32. Were you paid or promised a FIXED amount of wages per pay period, no matter how many hours you worked (for example, $400 per week, regardless of how many hours you worked)?

☒ YES: I was paid $ _____ per ☐ day ☐ week ☐ every 2 weeks ☐ month ☐ semi-monthly
☐ other (specify): _____

I was promised $ **150,000** per ☐ day ☐ week ☐ every 2 weeks ☐ month ☐ semi-monthly
☒ other (specify): annum (paid twice per month)

☐ NO.

| | |
|---|---|
| 33a. Were you an HOURLY employee?<br><br>☐ YES: I was paid $_____ per hour.<br> I was promised $ _____ per hour.<br>☒ NO | 33b. If you were an HOURLY employee, were you paid or promised more than one hourly rate (based on the hours you worked or different job tasks)?<br><br>☐ YES (describe): *N/A*<br><br>☐ NO |

34. Were you paid by PIECE RATE? ☐ YES ☒ NO    35. Were you paid by COMMISSION? ☐ YES ☒ NO

## Part 7: WAGES, COMPENSATION & PENALTIES OWED

| 36. CLAIMS<br>(Check all boxes below that apply) | CLAIM PERIOD:<br>START DATE<br>(Month/Day/Year) | CLAIM PERIOD:<br>END DATE<br>(Month/Day/Year) | AMOUNT EARNED / CLAIMED |
|---|---|---|---|
| ☒ REGULAR WAGES (for non-overtime hours) | 10/26/2017 | 6/20/2019 | $ 247,397.26 |
| ☐ OVERTIME WAGES (including double time) | | | $ |
| ☐ MEAL PERIOD WAGES | | | $ |
| ☐ REST PERIOD WAGES | | | $ |
| ☐ SPLIT SHIFT PREMIUM | | | $ |
| ☐ REPORTING TIME PAY | | | $ |
| ☐ COMMISSIONS *** | | | $ |
| ☐ VACATION WAGES *** | | | $ |
| ☐ BUSINESS EXPENSES | | | $ |
| ☐ UNLAWFUL DEDUCTIONS | | | $ |
| ☐ OTHER (Specify): | | | $ |
| ENTER SUBTOTAL (add all Amounts Earned/Claimed) | | | $ 247,397.26 |
| ENTER TOTAL AMOUNT PAID | | | $ 0 |
| GRAND TOTAL OWED [Subtotal minus Total Amount Paid]: | | | $ 247,397.26 |

*** Additional DLSE form should be submitted if you are making this claim. See "Instructions for Filing a Wage Claim."

37. Check box(es) if you are claiming: ☒ Waiting time penalties [Labor Code §203]
☐ Penalties for "bounced" checks (checks issued with insufficient funds) [Labor Code §203.1]

*I hereby certify that the information I have provided is true to the best of my knowledge and/or recollection. The amounts claimed are based on my best estimates at this time and may be adjusted based on further information, or based on assistance with my claim provided by DLSE.*

Signed: _____    Date: June 18th, 2020

Print Name: **Carl A. Wescott**

DLSE FORM 1 / WAGE ADJUDICATION (REV. 7/2012)    (CONTINUED – Page 3 of 3)

**GLUCK DANIEL**
L L P


Exhibit G

Craig C. Daniel
415.510.2509 (direct)
cdaniel@gluckdaniel.com

July 31, 2020

Via email
(laborcomm.wca.sfo@dir.ca.gov)

Debra Myers, Deputy Labor Commissioner
Wage Claim Adjudication

Department of Industrial Relations
Labor Commissioner's Office
455 Golden Gate Avenue, 10th Floor
San Francisco, California 94102

Re: WC-CM-793989 | SparkLabs Global Ventures Management LLC

Dear Deputy Commissioner Myers:

We represent SparkLabs Gobal Ventures Management LLC and related entities.  We appreciate this opportunity to respond to the Notice of Claim received on June 23, 2020.

### Introduction

Carl Wescott was never an employee of SparkLabs Global Ventures Management LLC or any of its related entities.

In 2016, Mr. Wescott offered his services to SparkLabs IoT Accelerator Fund, L.P. ("SparkLabs IoT"), a newly formed venture fund with no capital or operating budget. Mr. Wescott sought to raise funds and to mentor SparkLabs-funded startups in exchange for carried interest in the fund.[1]  He also hoped, if the fund raised enough capital to hire a salaried Managing Director, he would be well-placed to apply.

As Mr. Wescott himself wrote in February 2019, this arrangement is standard practice for venture capital and startups:

> However, it's established practice in the industry that people often have to raise a fund before they can get paid out of that fund (management fees).  I am working toward that as you know.  I expect some time this year I will start making some money from SparkLabs.  Hopefully :-).

> We'll discuss soon, but I'd rather put that time in to performing and raising money.[2]

---

[1] Carried interest refers to a percentage of fund profits.  Carried interest in a successful fund can be quite lucrative.  Where, as here, a fund does not close or has no profits, carried interest is worthless.

[2] Exhibit A (for context, Mr. Wescott wrote this email asking SparkLabs principal Bernard Moon for financial help during his divorce proceedings.  Mr. Wescott also refers to his ex-wife "lying under penalty of perjury to a judge that I made $100k a month when she knew I was homeless and on food

Unfortunately, Mr. Wescott and SparkLabs IoT's other Venture Partners were unsuccessful in raising capital (in fact, Mr. Wescott never brought in a single dime). SparkLabs IoT dissolved in August 2019 without an operating budget, much less a paid staff.

### Background to the Dispute

**The SparkLabs Entities**

SparkLabs Group is a network of venture capital funds and startup accelerators focused primarily on the U.S. and South Korea markets. SparkLabs is divided into traditional venture capital funds, managed by SparkLabs Global Ventures Management Ltd., and accelerator networks, managed by SparkLabs Global Accelerator Management Ltd.[3]

Only one SparkLabs principal, Bernard Moon, is based in the U.S. SparkLabs' accelerator operations, based in Seoul, South Korea, are managed by a Korea-based partner.

SparkLabs IoT was a Cayman Islands Limited Partnership registered on June 28, 2016 and based in Songdo, South Korea.[4] SparkLabs Group conceived SparkLabs IoT as a new accelerator fund focused on fostering startup companies in the "Internet of Things" space.

**Carl Wescott's affiliation with SparkLabs IoT**

As part of its mission to support startups, SparkLabs recruited a network of part-time volunteer "Venture Partners," who mentored SparkLabs-funded startups as a way to expand their networks and gain access to investment opportunities. In total, SparkLabs IoT had four such Venture Partners, all of whom received a small carried interest and reimbursement of travel expenses.

Carl Wescott had a background in venture capital and an interest in IoT startups. Shortly after SparkLabs IoT's formation, Mr. Wescott started pitching SparkLabs IoT to potential investors in exchange for a three percent carried interest.[5] Mr. Wescott came on board as a Venture Partner in early 2017, again for carried interest. Mr. Wescott would later describe the arrangement as an oral agreement with Bernard Moon:

> . . . Bernard suggested we deepen the relationship, and that I become a Venture Partner in SparkLabs IoT. I will have to look up what % of the carry I was to get; I think it was 3%. Though nothing was guaranteed, based on SparkLabs IoT being funded and making 16 investments with many more to come, I was to reasonably expect much more than US $50,000 over time.[6]

---

stamps." Clearly, in February 2019, Mr. Wescott did not consider himself a salaried employee of SparkLabs IoT or any other entity.

[3] An organizational chart is attached as Exhibit B.

[4] Exhibit C.

[5] Exhibit D.

[6] Exhibit E (much of this email describes a $50,000 consulting fee unrelated to the current proceedings).

On August 7, 2017, Mr. Wescott wrote to Mr. Moon about increasing his involvement, characterizing his efforts as "volunteering":

> As you know, and as mentioned, I'm having more fun with SparkLabs than with any other activity. I have a passion for helping entrepreneurs in Asia. I like and enjoy the people I'm working with. And I also see an amazing economic opportunity for SparkLabs. Thus, I keep volunteering to do more and more, and yes, I'm very interested in taking on more responsibility and being more involved.[7]

As Mr. Wescott well knew, a venture fund with no capital can't hire employees. Mr. Wescott told Mr. Moon he would help SparkLabs IoT raise capital for carried interest, and if they were successful, he wanted to be considered for a Managing Partner position, with a salary.

In an email dated August 8, 2017, Mr. Moon confirmed Mr. Wescott's three percent carry, said that it would be "awesome" if Mr. Wescott became SparkLabs IoT's Managing Partner, and speculated that his partners would agree.[8] Mr. Moon opined that if a job became available, the salary "I assume will be at least $150,000/year" with potential increases "depending on the amount that is raised and what we plan for the yearly budget." Mr. Moon also reiterated that SparkLabs IoT had already granted Mr. Wescott a three percent carried interest, which would result in payment if the fund closed and turned a profit.

As a savvy entrepreneur, a Venture Partner, and a fundraising advocate for SparkLabs IoT, Mr. Wescott was fully aware that SparkLabs IoT could not even consider salaried positions until it was funded, and that like all Venture Partners, he was entitled only to his carried interest until that time.

Mr. Wescott acknowledged this reality multiple times both verbally and in writing. For example:

On July 5, 2018, Mr. Moon wrote Mr. Wescott about potentially increasing Mr. Wescott's carried interest when another Venture Partner left. Mr. Wescott replied, "Thanks for sharing, Bernard. I appreciate what you propose. I want to earn my equity, though, and I don't feel that I have done so yet."[9] In July 2018, Mr. Wescott knew he wasn't working for a salary.

On February 1, 2019, Mr. Wescott wrote Mr. Moon that he was dropping out of "multiple grad schools" and pursuing a full-time job so he could have "two fulltime engagements, one that can pay me (the new one, whatever it will be) and one that can't (SparkLabs)."[10] Mr. Wescott further pledged to repay Mr. Moon for expenses Mr. Moon fronted on his behalf: "I might as well reimburse you for the SparkLabs-related expenses you have so kindly paid for me when I have money," including for his office, which is "non-SparkLabs related."

So as of February 2019, Mr. Wescott did not consider himself a SparkLabs IoT employee: not only did he fail to even mention the salary he now contends he was promised, he vowed to repay Mr. Moon for work-related expenses he had "kindly" paid for.

---

[7] Exhibit F.
[8] Exhibit G.
[9] Exhibit H.
[10] Exhibit I.

Mr. Moon replied that SparkLabs "hopefully . . . can do a first close soon and pay you," but that Mr. Wescott should "keep a full-time gig" either way.

On February 14, 2019, Mr. Wescott notified Mr. Moon that although he was earning money through consulting work, his financial situation was insecure. Again, even as Mr. Wescott appeared to be experiencing serious financial stress, he didn't claim that SparkLabs was withholding his salary. Quite the opposite: he thanked Mr. Moon for "your generosity in covering and/or paying various expenses in the past and your continued offers of assistance."[11]

In the February 20, 2019, email quoted above regarding Mr. Wescott's divorce proceedings (Exhibit A), Mr. Wescott confirmed that, like all Venture Partners, he received no income and "deserve[d] none at this point":

> To some all the flights I take that SparkLabs pays for might look suspicious given my lack of income. If I was Monette's attorney I might try to argue that we're reducing income (but I have none, and deserve none at this point) and paying my expenses.

> However, this is also our practice. It's not just me. Every mentor and Demo Day speakers get their flights and hotels covered when they go to Korea. (The former reimbursed by the Korean government a good part of the time).[12]

On April 4, 2019, Mr. Wescott asked SparkLabs to provide him a $500-per-month budget to "cover basic expenses including coffee, lunches, BART, bus, CalTrain when meeting with investors."[13] It's clear that while Mr. Wescott was "still searching for a job that will pay me (in addition to working for SparkLabs)," his only expectation for compensation from SparkLabs was carried interest.

On June 5, 2019, Mr. Wescott wrote to Mr. Moon asking for a $50,000 payment in an unrelated transaction. Far from demanding wages from SparkLabs IoT, Mr. Wescott acknowledged that SparkLabs IoT was not yet in a position to hire him: "As you know, while SparkLabs cannot afford to pay me, I've been doing what I can to get monies in part-time (or even full-time on the side)."[14]

Unable to raise capital, SparkLabs IoT was dissolved in August 2019 and the portfolio companies under its umbrella were moved to other funds.

**SparkLabs IoT disassociates itself with Mr. Wescott**

Not long after Mr. Wescott began fundraising for SparkLabs IoT, it became clear that his self-professed fundraising abilities were overblown: he never sourced a single investor for SparkLabs IoT, and it's unclear whether he even tried. Mr. Wescott was up front in telling Mr. Moon that SparkLabs was one of many projects he undertook in that time period. As one example, Mr. Wescott said was enrolled in "multiple grad schools" in 2018.

---

[11] Exhibit J.

[12] Exhibit A.

[13] Exhibit K.

[14] Exhibit L (extraneous and attorney-client communications redacted).

Moreover, between March and June 2019, the SparkLabs principals learned that Mr. Wescott (i) had a $20 million judgment against him in a lengthy divorce involving extensive allegations of violence and abuse, (ii) had a $1.8 million civil judgment on an unpaid debt, and (iii) was homeless. Even more alarming, SparkLabs learned that the State of California declared Mr. Wescott a vexatious litigant in May 2017 for filing dozens of frivolous lawsuits.[15]

These revelations of instability, violent tendencies, and obsessive behavior shook SparkLabs' confidence in Mr. Wescott's character, as his failure to bring in capital shook their faith in his abilities.

By June 2019, Mr. Wescott's situation had deteriorated. Though he still acknowledged that he was only entitled to carried interest (which was looking less and less likely to pay off by this time), Mr. Wescott now routinely asked Bernard Moon and others for personal loans (which Mr. Moon gave him) and he appeared to be living either on friends' sofas or in complimentary hotel rooms provided for attendance at SparkLabs events in South Korea.

Though Mr. Wescott's failure to source investment for SparkLabs was reason enough to separate from him, his personal turmoil threatened to tarnish IoT's reputation (and might already have sealed its doom).

On June 7, 2019, SparkLabs asked Mr. Wescott to stop all activities on SparkLabs' behalf. In response, Mr. Wescott wrote a long email demanding $50,000 based on an oral contract formed "perhaps 2015 or 2016."[16] In that email, Mr. Wescott recounted an oral conversation in which Mr. Moon promised Mr. Wescott carried interest for his involvement in SparkLabs IoT and threatened various legal actions. Tellingly, Mr. Wescott did not demand a salary or claim he had been promised one.

On June 20, 2019, Mr. Moon told Mr. Wescott in writing to disassociate himself from SparkLabs:

> On June 7th, Jimmy sent you an email confirming that you should stop all SparkLabs activity, and that you should proceed with your proposed "resignation." Since you don't have a formal role with the organization, we did not think any formal resignation or transition process was needed. Jimmy only asked that you show us the resignation message you planned to send out, so that we were comfortable with your proposed messaging.[17]

SparkLabs formally cut ties with Mr. Wescott, telling him not to travel to South Korea for a SparkLabs "Demo-Day" the following week (even though SparkLabs had already paid for his travel). Nevertheless, Mr. Wescott showed up uninvited.

Though this is not a wrongful termination proceeding, Mr. Wescott has claimed SparkLabs fired him because he "discovered securities fraud at SparkLabs." It's not clear what he is referring to, but SparkLabs denies anything other than Mr. Wescott's demonstrated failure to raise funds and the serious questions about his character influenced its decision.

---

[15] Exhibit M (relevant pages).

[16] Exhibit E.

[17] Exhibit E.

July 31, 2020                                                                 Page 6 of 7

**Mr. Wescott, for the first time, claims SparkLabs promised him a salary.**

Mr. Wescott never claimed SparkLabs owed him a salary until he filed this claim. Now, he says Mr. Moon told him in December 2017 that SparkLabs would "set[] up a California entity and payroll for [him]."[18] That conversation did not happen. First, SparkLabs IoT was a South Korean fund and all of its activities were directed at South Korea. So even if SparkLabs IoT could have hired staff, it would have done so in South Korea, not California. Second, investment professionals are typically paid consulting fees, not salaries, and the SparkLabs funds are no different.[19] So setting up a payroll mechanism would make no sense.

### Legal Argument

**Mr. Wescott was not a SparkLabs IoT employee.**

As discussed above, Mr. Wescott affiliated himself with SparkLabs IoT, a Cayman Islands entity based in South Korea, as a Venture Partner and mentor in exchange for carried interest. This is a typical arrangement in the venture capital world. Mr. Wescott's claim that he—a sophisticated and experienced investor—had a salaried position with a non-funded Korean startup accelerator defies credibility.

Mr. Wescott places great stock in Mr. Moon's August 8, 2017 statement that it would be "awesome" if Mr. Wescott became SparkLabs IoT's Managing Partner.[20] Mr. Moon's statement was, at most, an aspiration following Mr. Wescott's stated desire to become more involved. He expressly said future employment had not been approved by the partners, both parties knew SparkLabs IoT would have to be capitalized to hire anyone, and Mr. Moon's email only speculates about an "assumed" salary.

Mr. Moon did include a table confirming Mr. Wescott's carried interest percentage, which SparkLabs IoT was prepared to honor if the fund closed. There is zero indication in Mr. Moon's email that he intended to make a job offer. And given SparkLabs IoT's lack of funding at the time, it is not plausible that Mr. Wescott read it that way.

Mr. Wescott claims he accepted employment two months later, in October 2017. But he produced no evidence of that, and there is none. Instead, in emails attached to this letter, he repeatedly referred to his efforts as "volunteer work" and he acknowledged his carried interest and non-salaried status in writing. He never once asked to be paid a salary, even as he complained about his personal financial situation and tried to extort $50,000 on an alleged oral agreement unrelated to this proceeding.

**Mr. Wescott's claim is largely barred by the statute of limitations.**

Even if Mr. Wescott were entitled to wages, the bulk of his claim would be time-barred. Mr. Wescott variously claims SparkLabs IoT "hired" Mr. Wescott via an oral agreement sometime in 2015, 2016, or 2017. The statute of limitations for an oral contract is two years,[21] and a claim for unpaid salary accrues

---

[18] Notice of Claim.

[19] SparkLabs Managing Partners receive K-1s, which can be verified through SparkLabs Group's accounting firm E&Y.

[20] Exhibit G.

[21] Cal. Code Civ. Proc. § 339.

July 31, 2020                                                                   Page 7 of 7

each time wages are legally due, i.e, on each payday.[22]  Mr. Wescott appears to have filed his claim on June 18, 2020, so any wages he claims for work performed prior to June 18, 2018 are barred.

**Even if Mr. Wescott were entitled to wages, his salary would not have been $150,000 per year**

Mr. Wescott bases his demand for $150,000 per year on the August 8, 2017 email Mr. Moon wrote regarding hypothetical future employment.  In that email, Mr. Moon tells Mr. Wescott it would be "awesome" to hire him, that his partners have not approved a position, and that he "assumes" that a Managing Director for SparkLabs IoT might be paid "at least $150,000/year."

Mr. Moon's speculation about a position that did not yet exist is not a reasonable benchmark for services performed on behalf of a non-funded venture fund.  Instead, any wage awarded should reflect the work Mr. Wescott was asked to perform and his failure to perform that work, and should be offset by the potentially large upside of his carried interest.

**Waiting time penalties are not warranted here.**

Waiting time penalties are available only when an employer "willfully" withholds wages.[23]  For years, Mr. Wescott never mentioned his expectation of a salary, and he constantly referred to a future when SparkLabs IoT would be funded and able to hire him.  SparkLabs IoT's belief that Mr. Wescott had offered his services in exchange for carried interest was accurate and reasonable.

**Conclusion**

Mr. Wescott is a savvy and intelligent man steeped in the standard practices of venture capital and startup companies.  He knew exactly what he was doing when he agreed to help SparkLabs IoT locate investors in exchange for carried interest in the fund.  He also knew that startup funds *cannot* pay salaries until they are funded.

There is a reason Mr. Wescott never complained about his "missing" salary while he was affiliated with SparkLabs IoT: he knew he was neither promised a salary nor entitled to one.  The SparkLabs Group appreciates the opportunity to demonstrate the same to the Labor Commission.

Very truly yours,

Craig C. Daniel

---

[22] *Cuadra v. Millan*, 17 Cal. 4th 855, 859 (1998).
[23] Cal. Lab. Code § 203.

August 18th, 2020



Debra Myers, Deputy Labor Commissioner
State of California
Department of Industrial Relations
Division of Labor Standards Enforcement

455 Golden Gate Ave.,
10th Floor
San Francisco, CA 94102

(415) 703-5300
LaborComm.WCA.SFO@dir.ca.gov

Dear Ms. Myers:

I have read through the response to my claim for unpaid salary by the SparkLabs Group, thank you.

Because I requested the forms so I can subpoena and receive the emails that back up my allegations, I am keeping this particular response short. Once I have the evidence that further proves my assertions, I will make a much larger submission and/or prove my case at the hearing.

The emails I will subpoena will include some of the discussions of my unpaid salary, setting up payroll for me (which never happened), reimbursing US $27k+ of tuition expenses for me in January 2018 since payroll hadn't been set up yet, and the details of what I did and the projects I managed 40+ hours a week for the 21 months or so that I was a full-time employee of the SparkLabs Group.

The emails will also show me working with Eugene Kim and others at SparkLabs in 2018 to move 14 of the 16 companies that were supposedly SparkLabs Smart City and IoT Fund, LP ("SparkLabs IoT") investments to be Korea Fund, II ("KF II") investments. KF II was the fund that had wired the monies for the 16 companies that SparkLabs IoT had supposedly invested in. To effectuate that move in 2018, we had to have the companies' cap tables (capitalization tables) reflect Korea Fund, II as their investor, and we also had to sign new investment agreements with those companies (as Korea Fund II rather than SparkLabs IoT, which had signed the original term sheets and investment agreements). The relevance and importance of those emails and documents shall be further explained below.

1

<u>Entities</u>

First, I note that SparkLabs is trying to change my putative employer to SparkLabs Global Ventures Management LLC. I was supposed to be a full-time salaried employee, initially, of the General Partner of SparkLabs Smart City and IoT Fund, LP ("SparkLabs IoT", abbreviated), an accelerator fund.

You are likely quite familiar with accelerator funds like Y Combinator, but in my more detailed future submission, I will include a backgrounder that explains how they operate, as it is relevant to the SparkLabs Group.

However, despite assurances made to me and claims made to the public by Bernard Moon that the SparkLabs IoT accelerator fund had raised money and funded 16 investments in 2016 and 2017, and had plenty of funds for at least a year of runway, those public announcements and private assurances regarding SparkLabs IoT were false. The false statements made to the public about that particular security (the SparkLabs IoT accelerator fund), as well as the inter-fund loans from Korea Fund II to SparkLabs IoT, constitute securities fraud. (Exhibit A, letter to SEC).

Within a few months of my beginning my full-time job, it was obvious to not only me, but also Bernard Moon and others at SparkLabs, that I would not be able to perform the anticipated duties for my full-time job of selecting companies to invest in, running cohorts, and helping those companies grow, as SparkLabs IoT had no money. The grants from the South Korean government had still not come in as expected.

Beginning in early 2018, since I was working full-time hours (40+ hours/week), and did not have enough to do for SparkLabs IoT (since SparkLabs IoT did not actually have money to invest, nor did it have money to pay me) my initial boss at SparkLabs, Bernard Moon, gave me other projects to work on, that I successfully carried out for the SparkLabs Group. (www.sparklabsgroup.com). The SparkLabs Group has quite a few more entities than Mr. Daniel is showing (I will provide a further list).

Assuming that my labor claim results in an order from the Labor Commissioner's office for my unpaid salary to be paid, I'd like to make sure it is directed at the various entities that I worked for, that have money to pay me. Hence, for now, I would like to keep my claim as originally filed, against the SparkLabs Group and its accelerator funds (I'll supply the list), rather than one LLC with limited assets and cash flow.

<u>Focus on my full-time job</u>

Second, the SparkLabs Group and its various entities are a complicated hierarchy of entities and people, and my relationships with those people and entities are also complicated.

2

Briefly, I began my work with SparkLabs in 2012 as a mentor for Korea Fund, I ("KF I"), and then Korea Fund, II. A few years later, I helped raise a million dollars for SparkLabs Global Ventures ("SGV") from Major League Baseball (which went into Global Seed Fund, I ("GSF, I")). There is a dispute about what was supposed to happen related to that which is prior to my job and unrelated to this claim (my viewpoint was that I was supposed to be paid $50,000 for that, and that was reinvested in to the fund that made 16 investments in to IoT companies in exchange for 3% of the General Partnership interests, which also resulted in my becoming a Venture Partner for SparkLabs IoT).

Though some of the claims made by SparkLabs related to what happened in 2016 (prior to my job offer or to starting my full-time job) are interesting, and perhaps can be used as litmus tests to help tell which party is telling the truth, I plan to keep the focus of my materials and evidence on:

* August 2017, when I was offered my full-time job with a US $150,000 salary
* My acceptance of that job offer (oral and then written in email)
* My beginning my full-time job and my duties for the first four months
* My requests to get paid, and the various excuses as to why that was not possible
* The discussions regarding setting up payroll for me
* The promise to pay $27k+ of my tuition expenses (made in December) because payroll was not set up yet, and I had not been paid.
* Part of my job duties for my full-time job in 2018:  cleaning up the securities fraud
* The rest of the projects I was tasked with, that I worked on and completed, as part of my 40+ hour workweeks from October 2017 through early July 2019.

My boss was Bernard Moon through 2018, and then, later, Jimmy Kim became my boss.

Securities fraud and other malfeasance related to my job

Third, I will also prove my allegations of securities fraud. My labor claim is not the appropriate nor final forum for that, but the SparkLabs IoT securities fraud is the elephant in the room and the glue that holds the rest of the narrative together. In proving what happened with SparkLabs IoT and KF II, the rest of the story fits together, and the various actions taken by the various stakeholders all fit in to context and make sense.

I was hired due to expected grants of the equivalent of about a million dollars a year from the South Korean government, promised by President Park Geun-hye (Exhibit A). My full-time job (as Managing Director of the accelerator fund, a type of venture fund) was supposed to be to invest those monies and run at least one accelerator fund cohort per year (of 8 or so portfolio companies that SparkLabs IoT had invested in), and then help those portfolio companies grow.

3

After President Park was indicted and then went to jail for corruption, those grants were delayed. Commitments had been made to the 16 IoT companies that SparkLabs was going to invest in, and thus, Korea Fund II wired the monies for those 16 investments, with Mr. Moon and partners still expecting that the grant money would come in to SparkLabs IoT to pay KF II back. (I never saw the loan document, but I was told that a loan was made from KF II to SparkLabs IoT to cover those 16 investments. Some of my emails as well as those of Mr. Moon and Mr. Eugene Kim, among others, reference that loan, as for a while, one of the options being discussed was that SparkLabs IoT would pay back the loan to KF II and remain the investor of record. That was before I understood that inter-fund loans are also illegal and also constitute securities fraud (Exhibit A)).

As the grants mostly did not come in (I was told that about $180,000 eventually trickled in), there was no money to pay my salary, and there was no money for me to invest in portfolio companies (on behalf of SparkLabs IoT), nor to run cohorts, nor to help companies grow (my annual budget was supposed to be about US $850,000).

My continued insistence that the securities fraud be cleaned up, and my threats to whistleblow to the SEC and others if SparkLabs did not clean up and disclose, also led to my firing. Things changed beginning in early March 2019, when Bernard Moon was clearly furious at me for continuing to insist that SparkLabs hire a specialist law firm, disclose to investors, and do whatever else the law firm suggested as part of the clean-up.

I believe I was fired in retaliation for insisting that the securities fraud be fully cleaned up and disclosed, and for my threats to whistleblow if SparkLabs did not do the right thing. Thus, the real reason for my firing was related to the securities fraud that I can and will prove, because it is the glue that holds the other parts of this narrative together.

As I will further prove, as part of a coverup for my missing salary (likely after deciding to fire me in retaliation), Mr. Moon later forged a version of my job offer email, and provided the forged version (in which he removed the sentence about my offered fulltime salary of US $150,000) as the true version to a court under penalty of perjury.

Thank you for your time and consideration.

Carl A. Wescott

4

Dear Carl Wescott,



*EXHIBIT I*

You filed a claim for wages and penalties on June 18, 2020. *On the same day*, we sent notice of your claim to both you and your former employer. The employer's attorney denied the claim and stated that you were never an employee.

Currently, there are two deputies in the San Francisco district office with less than three years' experience, each of whom has a caseload of more than 1,100 claims. Due to events outside of our control, we have one hearing officer who is still in training. As a natural consequence, we have thousands of cases that were not resolved informally between the parties waiting for formal hearing. There are cases that were filed in 2019 and referred to formal hearing that we *hope* to schedule for a hearing in the year 2022.

We are tasked with the robust enforcement of labor laws (with an emphasis on minimum standards). We are expected to serve as many California workers as possible in as expedited manner as possible. Requiring anyone to wait for years for justice is no justice at all.

I personally reviewed your file, and, with the authority provided by Labor Code § 98, I dismissed your case *without prejudice\**.

Even if we had referred your case to formal hearing, we do not have the injunctive power of the court to keep the employer from secreting the money owed to you. The most we can do is enter an Order, Decision, or Award of the Labor Commissioner in Superior Court, as a judgment good for 10 years.

\*While we have dismissed your claim, and that is final, you retain the right to file the matter in Superior Court (whoever has jurisdiction over San Jose), with or without legal representation, and put the power of the Court to work for you now, not years from now.

Thank you,
*Stephanie Barrett*
Senior Deputy
San Francisco Wage Claim Adjudication Unit
Division of Labor Standards Enforcement
Department of Industrial Relations
455 Golden Gate Avenue, 10th Floor NE
San Francisco, CA  94102
DLSE homepage
DIR.LaborComm.WCA.SFO@dir.ca.gov
DIR.LaborComm.WCA.SRO@dir.ca.gov



UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 6121 / September 12, 2022

ADMINISTRATIVE PROCEEDING
File No. 3-21063

| | |
|---|---|
| **In the Matter of**<br><br>    **SPARKLABS GLOBAL VENTURES MANAGEMENT, LLC, SPARKLABS MANAGEMENT, LLC AND BERNARD MOON,**<br><br>**Respondents.** | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE- AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against SparkLabs Global Ventures Management, LLC, SparkLabs Management, LLC, and Bernard Moon (collectively, "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over Respondents and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Summary

1.      This matter involves unauthorized and undisclosed inter-fund loan transactions by venture capital fund managers SparkLabs Global Ventures Management, LLC and SparkLabs Management, LLC, and their principal, Bernard Moon.  From at least 2016 through 2019 (the "Relevant Period"), Respondents directed certain funds they managed to make more than 50 loans totaling over $4.4 million to other funds under their management and affiliates of Respondents to help finance the borrowing funds' investment strategies and to meet their obligations to repay outstanding loans from other affiliated entities.

2.      By entering into these loans, Respondents breached their fiduciary duty to their clients.  In particular, the loans  violated the lending funds' operating agreements, which did not authorize the funds to use investment capital for loans to Respondents' affiliates, were for durations in excess of the limitations imposed in the funds' respective limited partnership agreements, and were made at below-market interest rates to affiliated borrowing funds with limited or no operating history.  In addition, Respondents repeatedly failed to enforce the terms of the loans when they were due.  In one instance, after a borrowing fund defaulted, Respondents accepted repayment in the form of shares in a portfolio company without conducting an independent valuation of those shares.  Respondents were solely responsible for determining the terms for each side of the respective transactions.  Thus the inter-fund loans and the Respondents' interest in the success of the larger SparkLabs organization, encompassing multiple funds, created conflicts of interest for Respondents as between various funds that they managed, which Respondents failed to disclose to the funds.

3.      Contrary to the funds' agreements, Respondents did not create any committees of limited partners that could have advised on or consented to potentially conflicted transactions, such as these loans.

4.      As a result, Respondents violated Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

### Respondents

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

5.      SparkLabs Global Ventures Management LLC ("SparkLabs GVM") (SEC No. 802-112315), a Delaware limited liability company with its principal place of business in Palo Alto, California, is an exempt reporting adviser reporting to the state of California since December 2017.[2] SparkLabs GVM is serves as the investment adviser for a series of venture capital funds, including SparkLabs Global Ventures Fund I, L.P. ("GVF I"), a Cayman Islands exempted limited partnership, and SparkLabs Global Ventures Fund II, L.P. ("GVF II"), a Cayman Islands limited partnership (collectively, the **"Venture Funds"**), , and is an affiliate of the General Partners for each of those Funds, SparkLabs Global Ventures General Partner I, L.P., and SparkLabs Global Ventures General Partner II, L.P.

6.      SparkLabs Management, LLC ("SparkLabs Management") (SEC No.  802-111979), a Delaware limited liability company, has been an exempt reporting adviser reporting to the state of California since September 29, 2017, with its principal place of business in Palo Alto, California.[3] It serves as the investment adviser for a series of early-stage venture capital funds and startup accelerators, including, among others, SparkLabs Korea Fund II, L.P. ("Korea Fund II"), a Cayman Islands limited partnership with its principal place of business in Seoul, Republic of Korea; SparkLabs Frontier ASU Fund I, L.P. ("Frontier Fund") a Delaware limited partnership with its principal place of business in Palo Alto, California; and SparkLabs Taipei Fund I, L.P., a Cayman Islands limited partnership with its principal place of business in Taipei, Taiwan (collectively, the **"Accelerator Funds"**).

7.      Bernard Moon ("Moon"), 51, is a resident of Moraga, California and an owner and managing member of both SparkLabs GVM and SparkLabs Management.  Moon also serves as a member of the general partner entities for each of the funds managed by SparkLabs Management and SparkLabs GVM.

### Background

8.      In 2013, Moon founded SparkLabs, a collection of related entities that includes Respondents SparkLabs GVM and SparkLabs Management, among other affiliates.  SparkLabs focuses on investments in the U.S. and Asia through both traditional seed-stage venture capital funds managed by SparkLabs GVM, and startup accelerators managed by SparkLabs Management (together, the "**SparkLabs Funds**" or the "**Funds**").

9.      SparkLabs Management manages the Accelerator Funds, which invest in seed-stage startup companies.  These funds pay the operational costs of the startups during the investment

---

[2] SparkLabs GVM claimed exempt reporting adviser status with the SEC in December 2017, which was withdrawn in October 2019.

[3] SparkLabs Management claimed exempt report adviser status with the SEC in September 2017, which was withdrawn in June 2022.

period, including staff salary, rent, management costs, and the costs of "demo days", in which the portfolio companies showcase their ideas to investors.

10.     SparkLabs GVM primarily advises private funds to invest in equity securities issued by private companies in the U.S., Asia, and Europe.  SparkLabs GVM charges the Venture Funds a management fee, which was 1.5% to 3% of committed capital during the Venture Funds' investment period.  SparkLabs GVM's affiliated general partners also received a carried interest of up to 20-25% of the net profits realized by the limited partners in the Venture Funds.

11.     The limited partnership agreements ("LPAs") and private placement memoranda governing SparkLabs Venture Funds, including GVF I and GVF II, required the creation of an "Advisory Committee" of limited partners in the funds to consult with the General Partner as to potential conflicts of interest.  In addition, the LPAs of certain of the SparkLabs Accelerator Funds required the creation of an advisory committee of limited partners or the approval of a majority in interest of limited partners prior to entering certain transactions, including with respect to conflicts of interest.  During the Relevant Period, SparkLabs did not create any committees of limited partners that could have advised on and consented to potentially conflicted transactions, including inter-fund loans.

## The Inter-Fund Loans

12.     The SparkLabs Funds' governing documents did not authorize the Funds to make loans to SparkLabs affiliates, nor did they describe the potential or actual conflicts of interest associated with such loans.  Despite that, from at least April 2016 through November 2019, on at least 54 occasions, Respondents caused certain SparkLabs Funds to lend a total of more than $4.4 million to other SparkLabs Funds and SparkLabs affiliates, including to SparkLabs GVM.  The borrowing SparkLabs Funds and SparkLabs affiliates used these loans to, among other things, finance investments and pay for operational expenses.  The General Partner for each of the Funds, and Bernard Moon as the Managing Member of each, was ultimately responsible for each of the Funds' investment decisions and for administering the affairs of the Funds, including whether and how to make disclosures (including in the Funds' financial statements) to investors.

13.     These loans also created a conflict of interest for Respondents because they were solely responsible for determining the terms for each side of the transactions between affiliated SparkLabs Funds, and had an interest in the success of the larger SparkLabs organization, encompassing multiple funds.  In particular, Respondents were responsible for (a) directing the lending Funds to make the loans; (b) determining the loan terms; and (c) determining when and whether the borrowing SparkLabs Funds and entities repaid those loans, including whether to enforce repayment and interest terms.  Although at least some of the Funds required the establishment of a committee of limited partners to address conflicts of interest, Respondents did not present these inter-fund loans to investors in the Funds or establish any advisory committees of investors.

14.    Respondents did not undertake a process to determine whether the loans were in the best interests of the lending Funds. In particular, the borrowing Funds were generally newly-formed funds with little or no operating history and without easily available options to secure similar loans in the market because of the higher credit risk they posed to potential lenders. Throughout the Relevant Period, Respondents caused the lending Funds to make the loans at below-market interest rates, ranging from 0.5% to 1%.

15.    On at least 10 occasions the borrowing SparkLabs entities did not timely repay outstanding loans, and in multiple instances, interest was not timely paid. Respondents did not take action on behalf of the lending Funds to renegotiate new terms or otherwise enforce these agreements when borrowing Funds defaulted, allowing the borrowing Funds an indeterminate time to repay those loans. At no point did they address the conflicts of interest arising from these loans with an advisory committee of investors.

*Loans Between Venture Funds*

16.    Between January 30, 2017 and June 27, 2017, GVF I made 16 separate loans totaling $371,391 to GVF II at a 1% interest rate, with each loan due on December 31, 2017. GVF II used these loans to pay for investments and operational expenses. GVF II had no capital commitments until March 2017, when it raised $1 million.

17.    On September 12, 2017, GVF II made a $250,000 investment in a portfolio company ("Company A"). On October 26, 2017, with partial principal and interest still outstanding on its earlier loans to GVF II, GVF I made another $200,000 loan to GVF II at a 1% interest rate, due December 31, 2018. GVF II used this loan to finance an investment in a portfolio company. GVF II did not repay this loan when due, and GVF I took no action to enforce repayment.

18.    On June 10, 2020, GVF II settled its outstanding debt to GVF I by transferring ownership of its investment in Company A to GVF I, although, at the time, GVF I was already fully invested. This transfer was contrary to the terms of the written loan documents, which required GVF II to repay the loans in U.S. dollars. In addition, SparkLabs GVM and Moon did not perform a valuation of Company A at the time of the transfer, but instead relied on a valuation performed during an earlier funding round for Company A in September 2017, in which GVF II was a minority investor.

19.    An investment adviser's fiduciary duty includes both a duty of loyalty and a duty of care. To fulfill these obligations, an adviser, among other things, must make full and fair disclosure to a client of conflicts of interest, and must provide investment advice in the best interest of its client based on the client's objectives.

20.    The LPA for GFV I required the formation of an "Advisory Committee" of limited partners with the authority to approve or disapprove certain transactions. In the Private Placement Memorandum for GFV I, SparkLabs Global Ventures Partner I, L.P., the General Partner for the

fund, represented that the fund's advisory committee would consult with the General Partner of the fund as to potential conflicts of interest. Bernard Moon was a member of the General Partner for the fund and primarily responsible for the Fund's investment activities. SparkLabs GVM and Moon did not disclose the loans and the resulting conflicts of interest at the time of the loans to GVF I, or create an advisory committee of limited partners in GVF I to which it could have disclosed such conflicts. While the notes to the 2016 and 2017 audited financial statements for GVF I, dated March 21, 2018, documented outstanding balances from related parties, including a note receivable from GVF II, those financial statements were published after the loans had been made and without consent from an advisory committee.

21.    SparkLabs GVM and Moon breached their duty of care to GVF I by recommending that the fund enter into a series of loans with GVF II at a below-market interest rate that did not account for the relative risk of default. In addition, they failed to enforce timely repayment of the loan, accepted payment in a form not authorized by the loan agreements, and did not obtain a current valuation of Company A stock which GVF I accepted as repayment from GVF II of overdue loans.

*Korea Fund II Loans*

22.    Starting in approximately June 2017 and through at least November 2019, Respondents Moon and SparkLabs Management caused Korea Fund II to lend over $1.78 million to multiple Accelerator Funds and affiliated entities, enabling those entities to preserve investment opportunities. For example, in November 2018 and March 2019, Respondents caused Korea Fund II to make two loans totaling $959,980 at a 1% interest rate to the Frontier Fund, an Accelerator Fund with no operational history, in order for the Frontier Fund to make an investment to which it had previously committed. Although the Frontier Fund anticipated capital commitments, at the time of the loans, those commitments were delayed and the timing of that investment was uncertain. The LPA for the Frontier Fund prohibited the fund from borrowing money from affiliated funds without the approval of an advisory committee of limited partners. The Frontier Fund did not form an advisory committee to approve these loan transactions, and did not repay these two loans to Korea Fund II until January 29, 2021, two years past the due date on the initial loan and over a year past the due date on the second loan.

23.    In addition, from April 2018 through July 2019, Respondents caused Korea Fund II to loan SparkLabs GVM, an affiliated investment adviser, over $360,000 for the cost of operations and professional fees for its management of GVF I and GVF II, also at a 1% interest rate. In total, by the end of July 2019, various SparkLabs Funds and affiliated entities owed Korea Fund II approximately $1.57 million.

24.    Starting in August 2019, with these loans still largely outstanding, Respondents caused Korea Fund II to borrow funds from other SparkLabs Funds and affiliated entities because it did not have available capital to meet its own needs. In August 2019, for example, SparkLabs Management caused Korea Fund II to borrow $960,000 from SparkLabs Partners, Inc.

6

("SparkLabs Partners"), a Korean-based affiliate, to pay for operational expenses and a follow-on investment. At the direction of SparkLabs Management and Moon, and based on their understanding of certain requirements under Korean law, Korea Fund II agreed to pay SparkLabs Partners a 6% interest rate on this loan. After Korea Fund II entered into this agreement, Respondents caused Korea Fund II to extend SparkLabs GVM additional loans at a 1% interest rate, despite Korea Fund II's existing obligation to repay a 6% interest rate loan from SparkLabs Partners.

25.     SparkLabs Management and Moon were conflicted in causing Korea Fund II to loan a significant portion of its cash and capital to the Frontier Fund and other SparkLabs-affiliates, including an affiliated investment adviser, and did not disclose these conflicts of interest. In addition, SparkLabs Management and Moon were conflicted when they caused Korea Fund II to extend a loan to the affiliated management company, SparkLabs GVM, at below-market rates using funds on which it was accruing a much higher interest rate.

26.     SparkLabs Management and Moon also breached their duty of care to Korea Fund II by (1) failing to analyze whether Korea Fund II's loans to SparkLabs affiliated entities at below-market rates were in the best interest of Korea Fund II, (2) failing to enforce the terms of those agreements, and (3) recommending that it make additional loans to SparkLabs GVM at a below-market interest rate at the same time Korea Fund II was accruing interest on a higher interest-rate loan to SparkLabs Partners.

### Additional Breaches of the Duty of Care

*Borrowing Duration Limitations*

27.     **SparkLabs GVM.** The LPA for GVF II provides that it may not borrow money "[e]xcept with regard to amounts borrowed for less than 180 days to satisfy the short-term needs of the partnership." During the Relevant Period, however, loans from GVF I to GVF II exceeded that limitation on at least seven occasions, ranging from 181 days to 1,147 days until repayment. For example, a loan of $200,000 on October 26, 2017 from GVF I to GVF II was due on December 31, 2018, but not repaid until June 10, 2020, 958 days later.

28.     **SparkLabs Management.** The LPA for Korea Fund II, managed by SparkLabs Management, contained limitations on borrowing for more than 180 days. In two instances during the Relevant Period, Korea Fund II borrowed funds from a SparkLabs affiliated fund, GVF I, with an initial due date that exceeded 180 days. Ultimately, these two loans were repaid 394 days and 299 days after each respective loan date.

*Borrowing Limitations*

7

29.     ***SparkLabs GVM***. SparkLabs Venture Funds exceeded limitations on borrowing as a percentage of committed capital. The LPA for GVF II prohibited the partnership from borrowing in excess of 10% of the total capital committed by its partnership. Despite this limitation, between April 2017 and October 2017, GVF II entered into a series of loans with GVF I, also managed by SparkLabs GVM, that exceeded 10% -- and at one point exceeded 31% -- of the fund's committed capital.

30.     ***SparkLabs Management***. SparkLabs Accelerator Funds also exceeded limitations on borrowing as a percentage of committed capital. For example, the LPA for Korea Fund II prohibited the fund from borrowing in excess of 10% of committed capital. In August 2019, with approximately $361,268 in outstanding loans borrowed from affiliated entities and only $10 million in committed capital, Korea Fund II borrowed $960,000 from SparkLabs Partners, a SparkLabs affiliated fund, amounting to an aggregate of 13% of committed capital.

31.     The LPA for the Frontier Fund, also managed by SparkLabs Management, prohibits borrowing from affiliated SparkLabs entities without the approval of an advisory committee of limited partners. Additionally, the LPA restricts the fund from borrowing that, in aggregate, exceeds 15% of committed capital without the approval of an advisory committee of limited partners. Although no advisory committee was ever formed for the Frontier Fund, the fund entered into two agreements with Korea Fund II, also managed by SparkLabs Management, to borrow funds. In November 2018, the Frontier Fund entered into an agreement to borrow $500,000 from Korea Fund II, due on December 31, 2019. In March 2019, the Frontier Fund entered into an agreement to borrow nearly $460,000 from Korea Fund II, due on December 31, 2020. At the time of these transactions, the Frontier Fund had not raised any committed capital. As a result of these loans, the Frontier Fund breached the borrowing limitations in its LPA as well as the requirement that it receive approval from an advisory committee of limited partners prior to borrowing from affiliated SparkLabs entities. The Frontier Fund repaid these loans in January 2021.

*Limitations on the Authority of the General Partners*

32.     The LPA for Korea Fund II prohibits its General Partner from causing the fund to enter into any transaction with a "GP Related Person," including any constituent partners, members, officers, or directors of the General Partner, the management company or any affiliate of those parties without the approval of a majority-in-interest of the fund's limited partners.

33.     On multiple occasions between April 2018 and November 2019, Korea Fund II's General Partner caused it to loan funds to SparkLabs GVM, the management company for the Venture Funds. The Fund Managers for Korea Fund II's General Partner included Moon, among others, who also served as constituent partners for General Partner Fund Managers for SparkLabs GVM, and was thus a "GP Related Person."

34.     Separately, in August 2019, SparkLabs Partners, another SparkLabs-affiliated entity, loaned Korea Fund II $960,000. Because the sole shareholders and controlling members of SL Partners were also constituent partners of Korea Fund II's General Partner, this transaction was

8

a violation of Korea Fund II's LPA. Respondents never sought or obtained the approval of a majority-in-interest of the Fund's limited partners to enter into these transactions with SparkLabs GVM or SparkLabs Partners.

## Violations

35.     Section 206(2) of the Advisers Act prohibits investment advisers from directly or indirectly engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." Proof of scienter is not required to establish a violation of Section 206(2) of the Advisers Act, but rather a violation may rest on a finding of simple negligence. *SEC v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963)). As a result of the conduct described above, SparkLabs Management, SparkLabs GVM, and Moon willfully violated Section 206(2) of the Advisers Act.[4]

36.     Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder make it unlawful for an investment adviser to a pooled investment vehicle to "[m]ake any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to an investor or prospective investor in the pooled investment vehicle," or "engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle." Scienter is not required to establish a violation of Section 206(4) or the rules thereunder. *Steadman*, 967 F.2d at 647. As a result of the conduct described above, SparkLabs Management, SparkLabs GVM, and Moon willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

## Remedial Acts

---

[4] "Willfully," for purposes of imposing relief under Sections 203(e) and 203(f) of the Advisers Act, "'means no more than that the person charged with the duty knows what he is doing.'" *Wonsover vs. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "also be aware that he is violating one of the Rules or Acts." *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir.1965). The decision in *The Robare Group, Ltd. v. SEC*, which construed the term "willfully" for purposes of a differently structured statutory provision, does not alter that standard. 922 F.3d 468, 478-79 (D.C. Cir. 2019) (setting forth the showing required to establish that a person has "willfully omit[ted]" material information from a required disclosure in violation of Section 207 of the Advisers Act).

37.     In determining to accept Respondents' Offers, the Commission considered remedial acts promptly undertaken by Respondents, including the establishment of advisory committees of limited partners for all active Funds, the hiring of a full-time controller to monitor compliance, and the adoption of policies against inter-fund loans.

## Undertakings

38.     Respondents shall notify past and current investors in the Funds of the settlement terms of this Order by sending a copy of this Order to each investor via mail, email, or such other method not unacceptable to the Commission staff, together with a cover letter in a form not unacceptable to the Commission staff, within 30 days of this Order.

39.     Respondents shall certify, in writing, compliance with the undertaking(s) set forth in paragraph 38 above. The certification shall identify the undertaking(s), provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondents agree to provide such evidence. The certification and supporting material shall be submitted to Jeremy Pendrey, Assistant Regional Director, Division of Enforcement, San Francisco Regional Office, Securities and Exchange Commission, 44 Montgomery Street, Suite 2800, San Francisco, CA 94104, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than 60 days from the date of the completion of the undertakings.

40.     For good cause shown, the Commission staff may extend any of the procedural dates relating to these undertakings. Deadlines for procedural dates shall be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered the last day.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Sections 203(e), 203(f), and 203(k) of the Advisers Act, it is hereby ORDERED that:

A.     Respondents shall cease and desist from committing or causing any violations and any future violations of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

B.     Respondents are censured.

C.     Respondents SparkLabs GVM and SparkLabs Management shall pay, jointly and severally, a civil penalty in the amount of $200,000 to the Securities and Exchange Commission.

Payment shall be made in the following installments: $50,000 within 90 days; $50,000 within 180 days; $50,000 within 270 days; and $50,000 within 360 days. Payment shall be applied first to post order interest, which accrues pursuant to 31 U.S.C. § 3717. Prior to making the final payment set forth herein, Respondents SparkLabs GVM and SparkLabs Management shall contact the staff of the Commission for the amount due. If Respondents SparkLabs GVM and SparkLabs Management fail to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

  D. Respondent Bernard Moon shall pay a civil penalty in the amount of $25,000 to the Securities and Exchange Commission. Payment shall be made in the following installments: $6,250 within 90 days; $6,250 within 180 days; $6,250 within 270 days; and $6,250 within 360 days. Payments shall be applied first to post order interest, which accrues pursuant to 31 U.S.C. § 3717. Prior to making the final payment set forth herein, Respondent Moon shall contact the staff of the Commission for the amount due. If Respondent Moon fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

  E. Payment must be made in one of the following ways:

   (1) Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

   (2) Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

   (3) Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

   Enterprise Services Center
   Accounts Receivable Branch
   HQ Bldg., Room 181, AMZ-341
   6500 South MacArthur Boulevard
   Oklahoma City, OK 73169

  Payments by check or money order must be accompanied by a cover letter identifying SparkLabs GVM, SparkLabs Management, and Bernard Moon as Respondents in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or

money order must be sent to C. Dabney O'Riordan, Co-Chief, Asset Management Unit, Division of Enforcement, U.S. Securities and Exchange Commission, 444 S. Flower Street, Suite 900, Los Angeles, CA 90071.

F.     Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

G.     Respondents shall comply with the undertaking(s) enumerated in Section III above.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the findings in this Order are true and admitted by Respondent Moon , and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent Moon under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent Moon of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

By the Commission.

Vanessa A. Countryman

Secretary

12